**KRAFT GENERAL FOODS, INC., Plaintiff,**

v.

**ALLIED OLD ENGLISH, INC., Defendant.**

**No. 93 Civ. 1256 (PKL).**

United States District Court, S.D. New York.

June 11, 1993.

124

Darby & Darby, P.C., New York City, (Ethan Horwitz, Alexandra D. Malatestinic, Amy Benjamin Jacka, of counsel), for plaintiff.

Stoll, Miskin, Previto & Hoffman, New York City, (Howard C. Miskin, of counsel), for defendant.

### OPINION AND ORDER

LEISURE, District Judge.

This is an action for false designation of origin, trademark and trade dress infringement, unfair competition, and dilution brought pursuant to sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, section 368–d of the New York General Business Law, and New York common law. Plaintiff Kraft General Foods, Inc. ("Kraft") manufactures "Bull's–Eye" barbecue sauce. Kraft alleges that the "Raging Bull" barbecue sauce distributed by defendant Allied Old English, Inc. ("Allied") infringes upon the trademark and trade dress rights subsisting in the "Bull's–Eye" name and packaging.

On April 6, 1993, Kraft brought a motion for a preliminary injunction by way of order to show cause. Kraft argues, in sum, that the defendant's use of the "Raging Bull" product name and the product packaging used in conjunction with that product are likely to cause confusion among the purchasers of barbecue sauces. Among the evidence submitted on Kraft's behalf are the results of a mall intercept survey which, according to

Kraft, demonstrates that the defendant's alleged infringement is likely to cause confusion among 26% of the purchasing public. The Court conducted a hearing on April 27, 1993, and the parties subsequently filed supplemental papers. For the following reasons, the motion for a preliminary injunction hereby is granted.

## BACKGROUND

Kraft introduced Bull's–Eye barbecue sauce on a regional basis in 1985 and began selling Bull's–Eye nationwide in 1987. Sales have risen to approximately 45 million dollars annually, representing a market share of 9.5% of all barbecue sauce sold. Declaration of Susan Wisner, dated March 2, 1993 ("Wisner Declaration"), ¶ 4. Bull's–Eye is marketed extensively in print advertisements and television commercials. During 1992, Kraft expended approximately five million dollars on print and television advertising for the Bull's–Eye line of products.

Bull's–Eye has been featured in more than twenty-five articles and is consistently rated as the top rated barbecue sauce or among the top three barbecue sauce brands tested. See, e.g., Wisner Declaration, Ex. 1 (Consumer Reports article and other articles). In addition, numerous articles have discussed Kraft's marketing strategy for Bull's–Eye sauce, noting the success of Kraft's methodology. See Wisner Declaration, Ex. 2.

Since its introduction in 1985, Bull's–Eye has been sold in a trade dress incorporating the following elements:

a clear glass bottle with a label having a very dark brown background on the main portion of the bottle, a centered BULL'S–EYE logo[1] on the label consisting of a colored bull's head design[2] at the top center of the logo, directly below the bull's head appearing the words BULL'S–EYE[3] in white, the flavor variety appearing directly below in colored lettering, and the words BIG BOLD TASTE directly below on a colored banner at the bottom center

of the logo. The colored portions of the label appear in a single color on each label, and different colors (such as red or green) are used to denote flavor varieties.

Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, at 3–4. Kraft has obtained trademark registrations for the mark BULL'S–EYE, the bull's head design mark used on the product label, and the BULL'S–EYE mark and design viewed together. See Wisner Declaration, ¶ 10 & Exs. 4–6.

Allied began to produce and test market a barbecue sauce product under the name Raging Bull in October 1991. Allied applied for trademark registration of the Raging Bull mark, which application was published for opposition on September 1, 1992. See Declaration of Howard C. Miskin, Esq., dated April 19, 1993, Exs. 6–7. No opposition to the registration of the Raging Bull mark was filed. See id., Ex. 8. Pending acceptance of Allied's Statement of Use, the Raging Bull mark should be registered in due course.

Although Allied knew that Kraft's Bull's–Eye barbecue sauce was on the market, "no one ever mentioned the mark as a source of confusion" because its was not "even considered that 'Bull's–Eye' was close." Declaration of Frederick C. Ross, dated April 19, 1993 ("Ross Declaration"), ¶ 5. Rather, Allied was most concerned that the owners of the movie "Raging Bull" might object to Allied's use of the movie title as the name of its barbecue sauce. Id., ¶ 5.[4] The Raging Bull packaging includes a sketch of "an angry, excited bull." Id., ¶ 8. The packaging is further described as follows:

It is a single label extending substantially around the bottle. Dark red or burgundy was chosen for the bull's head to play up the "raging" aspect and to denote "power" and "zest". The color of the sauce is dark based on its ingredients, so a dark label background was selected, which is black.

Id., ¶ 8.

Kraft alleges that Allied's use of the Raging Bull mark and the trade dress chosen for

---

1. U.S. TM Reg. No. 1,408,803.

2. U.S. TM Reg. No. 1,406,975.

3. U.S. TM Reg. No. 1,367,961.

4. Allied admits that the Raging Bull name was attractive because it had public recognition as a result of its previous use as a movie title. Ross Declaration, ¶ 5.

Allied's product are likely to cause confusion among the consuming public regarding the identity or origin of each product. Accordingly, Kraft claims that it is continuously and irreparably harmed while the Raging Bull sauce stays on the market in its present marketing form, in violation of the Lanham Act, New York's anti-dilution statute, and New York common law of unfair competition.

## DISCUSSION

A party seeking a preliminary injunction " 'must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward [that] party....'" *King v. Innovation Books*, 976 F.2d 824, 828 (2d Cir.1992) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991)); *accord Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988).

The showing of irreparable harm by the moving party must demonstrate more than the mere "possibility" of irreparable harm. Instead, the moving party must demonstrate "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). "In trademark cases, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of unreasonable harm." *American Cyanamid Co. v. Campagna Per Le Farmacie In Italia,*

*S.P.A.*, 847 F.2d 53, 55 (2d Cir.1988); *see also Western Pub.. Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 59 (2d Cir.1990) (irreparable harm established upon a showing that an "appreciable number of ordinarily prudent purchasers are likely to be misled, ... or merely confused, as to the source of the goods"); *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir.1985). Moreover, the injury resulting from trademark dilution or unfair competition is similar to a Lanham Act injury in that it is extremely unlikely that the moving party can be fully recompensed by money damages.

The issuance of a preliminary injunction is an extraordinary equitable remedy that should not be granted absent a clear showing that the moving party has met its burden of proof. *See Beech–Nut, Inc. v. Warner–Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973); *Berrigan v. Norton*, 451 F.2d 790, 793 (2d Cir.1971). With these basic principles in mind, the Court now turns to the merits of Kraft's application for a preliminary injunction.

## I. LANHAM ACT CLAIMS

Plaintiff Kraft has brought causes of action under the Lanham Act for trademark and trade dress infringement, 15 U.S.C. § 1114[5], and false designation of origin under 15 U.S.C. § 1125(a).[6] It is well settled that plaintiff must demonstrate likelihood of confusion in order to succeed on either of these claims under the Lanham Act. *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1074, No. 92–7882, slip op. at

---

**5.** Section 32(1) of the Lanham Act provides in pertinent part that:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

**6.** Section 43(a) of the Lanham Act provides in pertinent part that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

2903 (2d Cir. Apr. 28, 1993); *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 570–71 (2d Cir.1993). Thus, plaintiff must show that " 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 571 (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)).[7] The Court finds that Kraft has established a likelihood of success on the merits as to the "likelihood of confusion" issue.

### A. The Polaroid Factors

In order to determine whether there is a "likelihood of confusion," the Court adheres to the multi-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In *Polaroid*, the Second Circuit considered the following factors in assessing likelihood of confusion:

(a) the strength of the prior owner's mark;

(b) the similarity between the two marks;

(c) the competitive proximity of the products;

(d) the likelihood that the prior user will bridge the gap;

(e) actual confusion;

(f) the defendant's good faith;

(g) the quality of defendant's product; and

(h) the sophistication of the buyers.

*W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citing *Polaroid Corp.*, 287 F.2d at 495); *see also Gruner + Jahr USA Publishing*, 991 F.2d at 1077. In applying this test, no single factor is dispositive, but rather the Court should "weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572; *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983).

### (1) Strength of the Mark

The "strength of the mark" analysis focuses on " 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (quoting *McGregor–Doniger Inc.*, 599 F.2d at 1131); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir.1987). A mark's strength is measured by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572.

■ The Court finds that the Bull's–Eye mark is a strong mark for two separate reasons. First, the mark is conceptually distinct. The four basic classifications of trademark, based upon the inherent distinctiveness of the mark and arranged from least to greatest protection accorded, are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *W.W.W. Pharmaceutical*, 984 F.2d at 572 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 170 (2d Cir. 1991). The Second Circuit has defined these categories as follows:

A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of goods...." Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning

---

7. It is uncontested that Allied used the Raging Bull mark in commerce without the consent of Kraft. Therefore, the only issues to be resolved by the Court are whether Allied's mark is a "copy or colorable imitation" of Kraft's mark and whether Allied's use of the Raging Bull mark is likely to cause confusion. *Gruner + Jahr USA Publishing*, 991 F.2d at 1075.

and "with ease of establishing infringement."

*W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citations omitted). The Second Circuit has noted that "[s]uperimposed on this framework is the rule that registered trademarks are presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986); *McGregor–Doniger Inc.*, 599 F.2d at 1132.

In the instant case, it is clear that the Bull's–Eye mark must be considered to be a suggestive mark. "Bull's–Eye" does not describe the barbecue sauce or any of its features, qualities or ingredients. Rather, the consumer must extrapolate from the words of the mark and use imagination to determine the nature of the goods marketed under the Bull's–Eye brand name. Further, even the term "bull", which is part of both marks at issue in this case, is not a generic term when used in connection with barbecue sauce. "Bull" does not describe the product or its features. The consumer must use imagination to connect the term "bull" with barbecue sauce.

■ Suggestive marks are entitled to protection without proof of secondary meaning. *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 212–13 (2d Cir.1985); *McGregor–Doniger Inc.*, 599 F.2d at 1131. Accordingly, the Court's finding that Bull's–Eye is a suggestive mark is dispositive of this *Polaroid* factor. The strength of the Bull's–Eye mark supports Kraft's motion for a preliminary injunction.

■ Kraft, however, has demonstrated that the Bull's–Eye mark has acquired strong secondary meaning, thus providing a second basis for a finding that it is a strong mark. " 'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir.1992) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d

606 (1982) (citation omitted)). Therefore, "the crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods, but the source of those goods,' *even though the relevant consuming public might not know the name of the producer." Centaur Communications, Ltd.*, 830 F.2d at 1226 (emphasis added) (quoting *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987)).

■ Secondary meaning is a factual determination which "entails vigorous evidentiary requirements." *Thompson Medical Co.*, 753 F.2d at 217 (quotation omitted). The indicia which are commonly recognized as tending to show secondary meaning are (1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *See Thompson Medical Co.*, 753 F.2d at 217; *American Direct Marketing, Inc. v. Azad Int'l, Inc.*, 783 F.Supp. 84, 92 (E.D.N.Y.1992); *Sage Realty Corp. v. Sage Group, Inc.*, 711 F.Supp. 134, 143 (S.D.N.Y.1989); *see also Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1197 (E.D.N.Y.1983) ("through plaintiff's advertising and marketing efforts the plaintiff's mark [Toys "R" Us] has developed strong secondary meaning as a source of children's products"). An analysis of these factors reveals that Kraft has established secondary meaning in the Bull's–Eye mark and trade dress through years of exclusive use, extensive advertising, commercial success, and unsolicited media coverage.

Bull's–Eye has been the subject of extensive unsolicited attention by the press and is consistently rated among the top three barbecue sauces. Wisner Declaration, Ex. 1. Further, numerous articles have discussed the Bull's–Eye brand or Kraft's marketing campaign for the barbecue sauce. Wisner Declaration, Exs. 1 & 2. Additionally, Bull's–Eye continues to be marketed through an extensive advertising campaign. Bull's–Eye is advertised in print and on television at an annual cost of approximately five million dollars. Finally, the success of the Bull's–Eye product is evidenced by its annual sales of 45 million dollars and its commanding

9.5% market share of total barbecue sauce sales. Kraft has demonstrated that it has developed a strong secondary meaning for the Bull's–Eye mark through its efforts to market the product over the past eight years. Bull's–Eye therefore is entitled to strong protection under the Lanham Act. The strength of the Bull's–Eye mark clearly favors Kraft's motion for a preliminary injunction.

### (2) *The Similarity of the Marks*

Under this *Polaroid* factor, the Court considers the similarity of the marks in an effort to determine if such similarity is likely to provoke confusion among potential customers. *McGregor–Doniger Inc.,* 599 F.2d at 1133. Therefore, the Court must "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." *W.W.W. Pharmaceutical Co.,* 984 F.2d at 573. Properly considered are "the products' sizes, logos, typefaces, and package designs." *Id.,* 984 F.2d at 573. However, dissection of the mark into its various components is not appropriate, as "it is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important." *Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1117 (S.D.N.Y.1981); *see also McGregor–Doniger Inc.,* 599 F.2d at 1133.

In the instant case the Court finds that Kraft has sustained its burden of demonstrating that the Raging Bull mark and trade dress are confusingly similar to the Bull's–Eye mark and trade dress. Although some aspects of the Raging Bull trade dress may have been chosen for reasons of convenience or cost, the marked similarity between the products, when viewed as an integrated whole encompassing all of their constituent parts, is evident. The similarity of the bull's head designs and the closeness of the names of the products trade dresses clearly creates products that are confusingly similar. Moreover, the closeness of the Bull's–Eye and Raging Bull marks militates in favor of a finding of likelihood of confusion. Under the circumstances of this case, the Court finds that the similarity of the marks and trade dress favors Kraft.

### (3) *Proximity of the Products*

Under this prong of the inquiry, the Court considers whether the two products are in competition with each other. It is well-settled that "'[t]o the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.'" *W.W.W. Pharmaceutical Co.,* 984 F.2d at 573 (quoting *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 582 (2d Cir.1991)). In this case, the products are competing products that are in direct competition with each other. Accordingly, this factor favors Kraft.

### (4) *Bridging the Gap*

This factor addresses whether there is a likelihood that the prior user will enter the market occupied by the alleged infringer. *See Centaur Communications, Ltd.,* 830 F.2d at 1227. Here, Kraft and Allied currently operate in the same market. Consequently, there is no gap to bridge.

### (5) *Evidence of Actual Confusion*

Evidence of actual confusion is a strong indication that a likelihood of confusion exists. However, since actual confusion is difficult to prove, it is well established that actual confusion need not be shown to prove likelihood of confusion under the Lanham Act. *Coach Leatherware Co.,* 933 F.2d at 170–71; *Centaur Communications, Ltd.,* 830 F.2d at 1227; *Lois Sportswear, U.S.A., Inc.,* 799 F.2d at 875. In the instant case, however, Kraft has presented to the Court a market survey suggesting that a significant number of consumers are likely to confuse the Bull's–Eye and Raging Bull products when making purchasing decisions or to identify the products as originating from the same source.

In its reply brief, Kraft presented evidence in the form of a mall intercept survey that, it contends, demonstrates a likelihood of confusion between the Raging Bull and Bull's–Eye products or their origins. *See* Declaration of Walter McCullough, dated April 22, 1993 ("McCullough Declaration"), *passim* & Ex. 13. Monroe Mendelsohn Research conducted the survey using the following procedure. After being screened for eligibility, survey respondents

were first shown a display consisting of either the RAGING BULL Bar–B–Que Sauce or the Texas Best Barbecue Sauce and 9 other disguise products arranged horizontally on a shelf. They were told to look at each one as if they were considering buying it and were allowed to pick the product up if they desired. All products were then removed from the respondent's sight. Each respondent was then shown the BULL'S–EYE Barbecue Sauce and four other disguise products, one at a time, and asked whether the product was the same brand, or is made by the same company as the (PRODUCT TYPE) she saw earlier.

McCullough Declaration, ¶ 8. Monroe Mendelsohn Research's interpretation of the survey reveals that one out of every four consumers would be confused as to the origin or identity of the Raging Bull and Bull's–Eye products:

> The results indicate that when shown BULL'S–EYE Barbecue Sauce, 36 percent of those who initially saw RAGING BULL Bar–B–Que Sauce thought they had previously been shown BULL'S–EYE Barbecue Sauce. This compares to an 10 percent level among those who initially saw the TEXAS BEST Barbecue Sauce control product.
>
> [ ] It therefore can be concluded that the RAGING BULL Bar–B–Que Sauce will cause a 26 percent level of point-of-sale confusion (36% – 10% = 26%).

McCullough Declaration, ¶¶ 12–13. The survey methodology used in this case is virtually identical to that approved by the Honorable Kenneth Conboy, United States District Judge, Southern District of New York, in *Kraft General Foods, Inc. v. Friendship Dairies, Inc.,* 1991 WL 149755, *4–5, 1991 U.S. Dist. LEXIS 18213, *10, 19 U.S.P.Q.2d 1691, 1694 (S.D.N.Y.1991).

Allied has presented a lengthy affidavit sworn to by Herbert Abelson, a Senior Vice President at Response Analysis Corporation, attacking the Kraft survey as deficient in numerous respects. *See* Affidavit of Herbert Abelson, dated May 12, 1993 ("Abelson Aff."), *passim.* Although the Court credits Abelson's affidavit to the extent that experts may differ as to the ideal survey design, the Court finds the Kraft survey to be credible and accepts its findings. Further, the extreme demonstration of confusion evidenced by the survey demonstrates Kraft's likelihood of success on the merits, as even a substantially lesser showing of confusion would support Kraft's motion for a preliminary injunction. Indeed, although he criticized numerous aspects of the Kraft survey, Abelson did not give an opinion that the Kraft survey was wholly erroneous in its finding of confusion. Rather, he stated his belief that he could design a better survey that "would suggest a significantly smaller number about consumer confusion" than the Kraft survey. Abelson Aff., ¶ 27.

Under the circumstances, the Court accepts as credible the finding of the Kraft survey that substantial confusion between the Raging Bull and Bull's–Eye products and their origins is likely among members of the purchasing public. Consequently, Kraft has demonstrated a strong likelihood of actual confusion, and this *Polaroid* factor favors Kraft.

### (6) *Good Faith*

In assessing good faith, the Court must consider " 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.' " *W.W.W. Pharmaceutical Co.,* 984 F.2d at 575 (quoting *Lang,* 949 F.2d at 583). The "second-comer" doctrine was formulated by Judge Learned Hand to explain the law's treatment of and expectations regarding an entrant into an existing market:

> Why it should have chosen a mark that had long been employed by [plaintiff] and had become known to the trade instead of adopting some other means to identify [their] goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [plaintiff] had built up. Indeed, it is generally true that, as soon as we see that a second comer in a mark has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more.... [W]e feel bound to compel him to exercise his ingenuity in quarters further afield.

*American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 562–63 (2d Cir.1953) (quotations omitted), *quoted in Thompson Medical Co.*, 753 F.2d at 214. Although the second-comer doctrine has been supplanted by the *Polaroid* test, Judge Hand's admonition continues to be applicable to any new entrant into an existing market.

When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark as well as any confusion that might result concerning the common origin of that mark and the senior user's product. As was noted by the Court in *Toys "R" Us, Inc.*:

> On the assumption that a businessman will ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where ... there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive.

*Toys "R" Us, Inc.*, 559 F.Supp. at 1199 (quoting *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 514 (E.D.N.Y. 1975) (citations omitted)); *Harold F. Ritchie, Inc. v. Chesbrough–Pond's, Inc.*, 281 F.2d 755, 759 (2d Cir.1960) ("the multiplicity of similarities is objective evidence of defendant's conscious imitation of plaintiff's product").

The Court finds that there is some evidence that Allied selected and is utilizing the Raging Bull mark to capitalize, either directly or indirectly, from the favorable image and goodwill that the Bull's–Eye mark has developed in the minds of consumers as a result of Kraft's efforts in developing its mark. Allied was aware that Bull's–Eye was a leading barbecue sauce and would be Raging Bull's principal competition in the marketplace. Allied simply did not take the care required of the second comer to ensure that its mark did not infringe upon and usurp the goodwill of the prior mark. Allied apparently believes that Kraft should not be concerned with infringement of its mark as long as its own market share continues to increase.[8] Allied's suggestion that a trademark owner should not be permitted to enforce its rights if the damage is not extensive and it continues to have a strong position in the market is untenable and therefore is rejected by this Court.

The Court finds that there is some inferential evidence of Allied's bad faith in selecting the Raging Bull mark. Accordingly, this *Polaroid* factor slightly favors the granting of Kraft's application for a preliminary injunction.

### (7) *Quality of Defendant's Product*

This factor assesses whether the junior user's product is of a low quality. Courts have noted that "[i]f an infringing product is of inferior quality, the senior user is entitled to protect 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user....'" *W.W.W. Pharmaceutical Co.*, 984 F.2d at 575 (quoting *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976)). Kraft argues that Bull's–Eye is a premium product but that Raging Bull is marketed as a premium product in some markets and as a "mainstream" product in other markets. *See* Wisner Declaration, ¶ 13.[9] Allied failed to present evidence concerning Raging Bull's quality. Kraft's evidence consisted merely of the statement that it is "believed" that Raging Bull is sometimes marketed as a mainstream product. Accordingly, the Court finds that this factor is neutral.

---

8. *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, at 2 ("Kraft on the other hand faces, at worst, a questionable loss of some customers, but still increasing its market share.").

9. Premium and mainstream markets in barbecue sauce are differentiated by the concentration of tomato paste used in the product. *See* Wisner Declaration, ¶ 13.

### (8) *Sophistication of the Buyers*

This *Polaroid* factor examines the amount of care and attention a consumer takes in evaluating a product before making a purchase. *Plus Products,* 722 F.2d at 1007; *McGregor–Doniger Inc.,* 599 F.2d at 1137. The Second Circuit has noted that "[t]he greater the value of an article the more careful the typical consumer can be expected to be...." *McGregor–Doniger Inc.,* 599 F.2d at 1137. Sophisticated consumers are less likely to be confused regarding a product's source. *See Plus Products,* 722 F.2d at 1007; *Centaur Communications, Ltd.,* 830 F.2d at 1228.

The products sold by both plaintiff and defendant are relatively low-priced items intermingled with numerous other barbecue and other sauces on supermarket shelves. Consumers are likely to purchase these types of low-priced food items without devoting much time and attention to making the decision. Thus, the purchase of either party's product is not a major expenditure for most consumers and the packaging is unlikely to be carefully scrutinized by the customer before making a purchase. Under such circumstances, the likelihood that consumers will assume that Allied's product originates with a source that has some connection or affiliation to Kraft is substantially increased. This factor favors plaintiff.

### B. *Balancing the Factors*

Having carefully considered and weighed the eight *Polaroid* factors as well as the arguments and submissions of the parties, the Court finds that Kraft has demonstrated that there is sufficient evidence of likelihood of confusion to warrant the issuance of a preliminary injunction. While the *Polaroid* factors guide the Court's analysis, each infringement case presents a unique set of facts requiring an independent determination concerning the likelihood of confusion. *See Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 253 (2d Cir.1982). In this case, the *Polaroid* factors provide strong support for Kraft's motion for a preliminary injunction, as they demonstrate the similarity of the marks and trade dress at issue, the strength of the Bull's–Eye trademarks, and a likelihood of confusion among consumers of barbecue sauces resulting from Allied's choice of mark and trade dress. While the inference of bad faith is also a factor in the Court's decision, the Court would reach the same conclusion as to the likelihood of confusion even if a showing of good faith was made.

Trademark laws are designed to protect the goodwill and reputation of marks by preventing the use of such marks in competing and noncompeting markets where consumer confusion will result. The Court, applying the *Polaroid* factors to the unique facts of this case, finds that a likelihood of confusion as to the source or affiliation of defendant's product exists due to the use of a similar mark in an identical market. Accordingly, plaintiff has established a likelihood of success on the merits with respect to the causes of action for trademark and trade dress infringement, pursuant to 15 U.S.C. § 1114(1), and false designation of origin, pursuant to 15 U.S.C. § 1125(a), and a preliminary injunction on these grounds is warranted.

## II. DILUTION OF TRADEMARK

■ The plaintiff also asserts a cause of action pursuant to Section 368–d of the New York General Business Law. This anti-dilution statute provides as follows:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

New York Gen.Bus.Law § 368–d. As stated in the brief legislative history accompanying Section 368–d, the purpose of this statute is to prevent "the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." 1954 N.Y.Legis.Ann. 49. Thus, a claim for dilution lies where it is shown that "a defendant is attempting to 'feed[ ] upon the business reputation of an established distinctive trade-mark or name.'" *W.W.W. Pharmaceutical Co.,* 984 F.2d at 576

(quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977)). The mark need not be "famous" or "celebrated," but it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1032–33 (2d Cir.1989) (Sweet, J., concurring); *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983); *Toys "R" Us, Inc.*, 559 F.Supp. at 1206.

It is well established that to prevail on a claim under this section, a plaintiff must establish two elements. "First, plaintiff's mark must possess a distinctive quality capable of dilution." *Mead Data Central, Inc.*, 875 F.2d at 1030 (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)). "Second, plaintiff must show a likelihood of dilution." *Mead Data Central, Inc.*, 875 F.2d at 1030 (citing *Sally Gee, Inc.*, 699 F.2d at 625). The Second Circuit has emphasized that "[a]s section 368–d expressly states, a plaintiff need not show either competition between its product or service and that of the defendant or a likelihood of confusion as to the source of the goods or services." *Mead Data Central, Inc.*, 875 F.2d at 1030.[10]

## A. Distinctiveness of the Mark

The Second Circuit has noted that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead Data Central, Inc.*, 875 F.2d at 1030. Thus, the Court's earlier analysis of the strength of the Bull's–Eye mark in the infringement context applies with equal force in the dilution context. As noted earlier, a mark's strength is measured by its inherent distinctiveness as well as its distinctiveness in the marketplace. Bull's–Eye is a suggestive mark that is conceptually distinct.

Distinctiveness has also been defined as a mark which has acquired a secondary meaning. *Mead Data Central, Inc.*, 875 F.2d at 1030. As stated above, the Court has determined that the Bull's–Eye mark has developed a strong secondary meaning in the minds of consumers based upon the extensive advertising expenditures effected by Kraft on a national level, the significant unsolicited media coverage received by Bull's–Eye, and the overall commercial success of the product.

Accordingly, the Court finds that the Bull's–Eye mark has a distinctive quality capable of dilution based upon the conceptual strength of the mark and the secondary meaning the mark has acquired in the mind of the public.

## B. Likelihood of Dilution

The second element that plaintiff must satisfy under section 368–d is the likelihood of dilution. The Second Circuit has "defined dilution as either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Central, Inc.*, 875 F.2d at 1031; *see also Sally Gee, Inc.*, 699 F.2d at 625. It is abundantly clear that a plaintiff demonstrates a likelihood of dilution where the products operate in the same markets and the names are similar enough to cause confusion among the purchasing public. This confluence of factors "under the circumstances will inexorably lead to confusion in the public mind and will undoubtedly dilute the value of [the Bull's–Eye] name and trade mark." *Rainbow Ranch Corp. v. Rainbow Shops, Inc.*, 89 Misc.2d 808, 392 N.Y.S.2d

---

**10.** There is some ambiguity in the Second Circuit decisions as to whether "predatory intent" is a requisite element or merely a relevant, but not conclusive, factor. *Compare Sally Gee, Inc.*, 699 F.2d at 626 (absence of predatory intent is a "relevant factor") and *Mead Data Central, Inc.*, 875 F.2d at 1037 (Sweet, J., concurring) (predatory intent is a factor, but "not an independent element"), *with W.W.W. Pharmaceutical Co.*, 984 F.2d at 576–77 (suggesting that predatory intent is an "element" of the cause of action under Section 368–d); *see also Rainbow Ranch Corp. v. Rainbow Shops, Inc.*, 89 Misc.2d 808, 392 N.Y.S.2d 796, 799 (Sup.Ct.1977) (unnecessary to demonstrate fraudulent intent or intent to deceive). This issue is irrelevant in this case because the Court has found that there is sufficient evidence of predatory intent for purposes of establishing likelihood of success on the merits. *See infra.*

796, 799 (Sup.Ct.1977). The preceding discussion concerning Kraft's likelihood of success on its trademark infringement claim applies with equal force to the anti-dilution claim. Kraft has satisfied the burden of demonstrating a likelihood of dilution.

### C. Predatory Intent

Finally, the Court will address the issue of predatory intent in the dilution context. *Sally Gee, Inc.*, 699 F.2d at 626. As noted in the Court's discussion of the Lanham Act claims, there is evidence suggesting that Allied was not acting in good faith in adopting the mark and continuing to use that mark. First, Allied adopted the Raging Bull mark knowing that the Bull's–Eye mark is widely recognized and has acquired a secondary meaning within the marketplace. Moreover, Allied has continued to use that mark even after Kraft contacted defendant's counsel and objected to the use. While this type of evidence does not establish conclusive evidence of predatory intent, the Court, after examining the entire record, finds that Kraft has raised serious questions about Allied's predatory intent in adopting the mark and its continued use of that mark in the wake of Kraft's objections.

In sum, the Court finds that Kraft has demonstrated likelihood of success on the merits in arguing that defendant's continued use of the Bull's–Eye mark in selling barbecue sauce will dilute the mark. Therefore, Kraft is entitled to a preliminary injunction based upon the cause of action for dilution under Section 368–d.[11]

### III. COMMON LAW UNFAIR COMPETITION

In addition to the statutory claims discussed above, plaintiff also has brought a common law cause of action for unfair competition. It is well established that New York law recognizes an unfair competition cause of action for "palming off" goods as those of another. *See Shaw v. Time–Life Records*, 38 N.Y.2d 201, 206–07, 379 N.Y.S.2d 390, 395–96, 341 N.E.2d 817, 822–23 (1975). "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.*, 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir.1990) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y.1987)); *see also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980).

Kraft contends that Allied's use of the Raging Bull mark and trade dress falsely implies that there is a connection between the two products and thus argues that an unfair competition claim exists under New York law. To succeed under an unfair competition claim, a plaintiff must demonstrate a likelihood of confusion. Additionally, there must be some element or showing of bad faith. *See Saratoga Vichy Spring Co.*, 625 F.2d at 1044. The Court notes that, unlike the federal law claims, proof of secondary meaning need not be shown. *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139 (2d Cir.1992); *Morex S.p.A. v. Design Inst. America, Inc.*, 779 F.2d 799, 801 (2d Cir.1985); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 952–53 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

11. Allied argues that the Court is precluded from finding that the Raging Bull mark is confusingly similar to the Bull's–Eye mark by the fact that the Trademark Office permitted the registration of the Raging Bull mark. An administrative decision of the Trademark Office, however, is not binding on a court, although it may be persuasive. *See, e.g., Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1180 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985); *Letica Corp. v. Sweetheart Cup Co.*, 805 F.Supp. 482, 488 (E.D.Mich.1992) ("Thus, the status of defendant's application for trademark registration ... is not dispositive of any issue in this case."); *Cf. Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*, 687 F.Supp. 754, 762 (E.D.N.Y.1988), *aff'd in part and rev'd in part*, 874 F.2d 95 (2d Cir.1989). Accordingly, the acceptance of the Raging Bull mark for registration is not dispositive of the issues in this case, particularly since no decision was rendered by the Trademark Trial and Appeal Board because no opposition was filed against the registration of the Raging Bull mark.

In the instant case, the Court has already found, in the context of the Lanham Act claims, that plaintiff has demonstrated a likelihood of confusion among the purchasing public as to the origin or affiliation of the Raging Bull product. Moreover, based upon the copying of a well-known mark and trade dress and the continued use of that mark and trade dress after plaintiff conveyed its concerns to defendant, the Court also has found an element of "bad faith" on the part of Allied. While this preliminary showing of bad faith is not conclusive, it is sufficient for purposes of establishing a likelihood of success as to the unfair competition claim.

Accordingly, Kraft has shown a likelihood of success on the merits as to the claim for unfair competition and therefore has established a fourth independent ground for the issuance of a preliminary injunction.

## IV. IRREPARABLE HARM

■ The showing of irreparable harm by the moving party must be more than the mere "possibility" of irreparable harm. Instead, the moving party must demonstrate "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp.*, 917 F.2d at 79. The existence of a likelihood of confusion in a trademark case is strong evidence of irreparable harm because damage to reputation is difficult to prove or quantify. *See Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 41 (2d Cir.1986); *LeSportsac, Inc.,* 754 F.2d at 79. Moreover, the injury resulting from trademark dilution, or unfair competition, is similar to a Lanham Act injury in that it is extremely unlikely that the moving party can be fully recompensed by money damages.

■ The Court finds that Kraft has made a clear showing that it will suffer irreparable injury if defendant Allied is permitted to continue the distribution of barbecue sauce under the Raging Bull mark and trade dress.

Kraft has expended extensive resources in a concerted effort to associate the Bull's–Eye trademark and trade dress with a single, reliable source of high-quality barbecue sauce. As a result of the remarkable success of this campaign, the goodwill and reputation that Kraft has acquired is inextricably linked to the Bull's–Eye mark. The Bull's–Eye mark and trade dress have developed a secondary meaning in the minds of the general public. This image and identity is a critical element of the trademark's value.

■ Based upon the showing of likelihood of confusion, the Court finds that the use of the Raging Bull mark and trade dress will result in irreparable harm to the goodwill and reputation that Kraft has cultivated with respect to the Bull's–Eye mark and trade dress. Moreover, even in the absence of likelihood of confusion, the dilution of the Bull's–Eye mark also will result in irreparable harm. In this type of case, the loss of goodwill and reputation resulting from defendant's activities simply cannot be compensated adequately by an award of money damages. *See National Lampoon, Inc. v. American Broadcasting Cos.,* 376 F.Supp. 733 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2d Cir. 1974).[12]

## V. FORM AND SCOPE OF THE PRELIMINARY INJUNCTION

Having considered the submitted materials and the arguments of counsel at the April 27, 1993 hearing, the Court finds that the issuance of a preliminary injunction is warranted. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, the Court must set forth the scope of the preliminary injunction. In accordance with Rule 65(d), the following constitutes the form and scope of the preliminary injunction:

> It hereby is Ordered that pursuant to Federal Rule of Civil Procedure 65 the defendant Allied Old English, Inc., its officers, agents, servants, employees, subsidiary and related companies, and all persons acting for, with, by, through, or under it,

12. Allied argues that irreparable harm should not be presumed in this case because Kraft failed to timely move for a preliminary injunction. It is evident, however, that any delays that might be considered substantial were the result of ongoing efforts to settle this matter. Kraft should not be

penalized for any delay arising out of settlement efforts. *See Earth Technology Corp. v. Environmental Research & Tech., Inc.,* 222 U.S.P.Q. 585, 58, 1984 WL 877 (C.D.Cal.1983); *Nature's Bounty, Inc. v. SuperX Drugs Corp.,* 490 F.Supp. 50, 55–56 (E.D.N.Y.1980).

hereby are enjoined and restrained, *pendente lite*, from:

(1) using the trade dress represented in Exhibit 3 to the complaint in this action, or any other trade dress so similar to plaintiff's trade dress represented in Exhibit 4 to the complaint as to create a likelihood of confusion, mistake or deception, on or in connection with the advertising, promoting, offering for sale, or sale of any food product; and

(2) using the mark "Raging Bull," the bull's head logo, or any term or design confusingly similar to plaintiff's federally registered BULL'S-EYE trademarks, on or in connection with the advertising, promoting, offering for sale, or sale of any food product.

## VI. SECURITY

 Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must determine the amount of security that the applicant must post. The amount should reflect "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Under the circumstances of the instant case, the Court orders that plaintiff post bond in the amount of $100,000 by June 17, 1993.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiff Kraft General Foods, Inc. has demonstrated irreparable harm and a likelihood of success on the merits of its claims for trademark and trade dress infringement, false designation of origin, dilution, and unfair competition. Accordingly, plaintiff's motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, in the form specified above, hereby is granted. The parties are directed to appear for a pretrial status conference on Friday, August 6, 1993, at 10:30 in the forenoon, in Courtroom 36, United States Courthouse, 40 Foley Square, New York, New York.

**SO ORDERED.**