**BLOCKBUSTER ENTERTAINMENT GROUP, a division of Viacom, Inc., Plaintiff,**

v.

**LAYLCO, INC., d/b/a Video Busters, Videobusters, Inc., and Video Investment, Inc., d/b/a Video Busters, Defendants.**

No. 94–72173.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 23, 1994.

Nanci J. Grant, Dickinson, Wright, Moon, Van Dusen & Freeman, Bloomfield Hills, MI, Barry H. Gottfried, Ann K. Ford, Fisher, Wayland, Cooper, Leader & Zaragoza, LLP, Washington DC, for plaintiff.

Intissar Alkafaji, Detroit, MI, Jamal Hamood, Stone, Biber & O'Toole, Troy, MI, for defendants.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EDMUNDS, District Judge.

At a hearing on September 8 and October 21, 1994, this matter came before the Court on Plaintiff's motion for preliminary injunction. For the reasons set forth below, Plaintiff's motion is granted.

### I. Facts

Plaintiff Blockbuster Entertainment Group, a division of Viacom, Inc. ("Blockbuster"), is an entertainment company and the world's leading home video rental company. Blockbuster's retail operations include approximately 2,700 company-owned and 900 franchise-owned stores. Approximately 105

of Blockbuster's company-owned stores and five of its franchise-owned stores are located in Michigan. Approximately 30 of those Michigan stores are located in the metropolitan Detroit area. Last year, Blockbuster's systemwide revenue totalled almost $3 billion. Its total revenue is greater than its next 375 competitors combined. Pat Jordan, *Wayne Huizenga*, N.Y. Times, Dec. 5, 1993, at section 6, page 54. More than 40 million people carry Blockbuster membership cards. *Id.*

Blockbuster registered "Blockbuster" and "Blockbuster Video" as its service marks with the United States Patent and Trademark Office in 1986. Blockbuster also owns the following trade marks: "Blockbuster Kids," "Blockbuster Kids Recommended," "Chartbusters," "Quik Drop," "Youth Restricted Viewing," and "America's Family Video Store." Since 1986, Blockbuster has continually used these marks and has spent millions of dollars in promoting its name. Blockbuster spent approximately $75 million in advertising its brand name in 1993. In 1994 it expects to spend almost $150 million in furthering brand recognition. Press articles indicate that Blockbuster's name is highly distinctive—one even likened Blockbuster's mark to McDonald's golden arches, *id.*—and that Blockbuster's reputation as a family-oriented business that refuses to rent x-rated videos is a significant business asset, *see id.*; Rupert Steiner, "Clash of video rental giants," *London Times*, June 26, 1994.

Defendants Laylco, Inc., Videobusters, Inc., and Video Investment, Inc., and Videobusters, Inc., all doing business as Video Busters ("Video Busters"), are also in the video rental business. They are three separately-owned stores in the Detroit area that use the "Video Busters" name. Defendant Laylco, Inc.'s "Video Busters" store is located in St. Clair Shores, Michigan, and has used the "Video Busters" name since 1991. Defendant Videobusters, Inc., is located in Southfield, Michigan and has used its name since 1989. Defendant Video Investment, Inc.'s "Video Busters" store is located in Lincoln Park, Michigan, and has used the "Video Busters" name since 1989. Blockbuster filed a complaint alleging that the Video Busters name infringes Blockbuster's trade marks under 15 U.S.C. § 1114. Blockbuster seeks to enjoin Video Busters from using their name to market video products and services identical to those marketed by Blockbuster.

Shakir Alkhafaji, the principal of Video Busters, Inc., gave two explanations for his choice of the Video Busters name for his store. First, Mr. Alkhafaji testified that he picked "Video Busters" to imitate the name of the popular movie "Ghostbusters." Mr. Alkhafaji made extensive use of the Ghostbusters movie logo in marketing his store until the owner of the Ghostbusters mark demanded that he stop doing so or face another suit for trademark infringement. Second, Mr. Alkhafaji testified that he chose the name because his video store was growing so fast that it was "busting through the walls." Defendants Laylco, Inc., and Video Investment, Inc., have not indicated why they picked the name "Video Busters."

The Video Busters stores carry video cassettes of movies rated "X" or "NC–17," while Blockbuster refuses to carry such videos. Two Video Busters stores have been charged with copying tapes in violation of federal copyright laws. Defendant Videobusters, Inc., has entered into two guilty pleas for criminal copyright violations. Defendant Laylco, Inc., was sued by Columbia Pictures last year for copying tapes and entered into a permanent injunction agreeing not to do so again.

## II. Standard for Preliminary Injunction

The availability of injunctive relief is a procedural question governed by federal law. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir.1991). The Sixth Circuit has held that a court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a strong or substantial likelihood of success on the merits;

2. whether the movant has demonstrated irreparable injury;

3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Parker v. U.S. Dept. of Agric.*, 879 F.2d 1362, 1367 (6th Cir.1989). The foregoing factors should balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). Where the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation. *Id.* at 1230. Alternatively, the court may also issue a preliminary injunction if the movant "at least shows serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985) (citations omitted).

### III. Likelihood of success on the merits

In analyzing whether Defendants have infringed a trademark such as "Blockbuster Video," the Sixth Circuit looks to eight factors under the Lanham Act: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the likely degree of purchaser care; (7) the defendants' intent on selecting the its mark; and (8) the likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). These factors "are simply a guide to help determine whether confusion would be likely to result from simultaneous use of ... two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas ("Wynn Oil I")*, 839 F.2d 1183, 1186 (6th Cir.1988). "The general concept underlying the likelihood of confusion [test] is that the public believe that the mark's owner sponsored or otherwise approved the use of the trademark." *Carson v. Here's Johnny*

*Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir.1983). Therefore, the court must examine the eight factors identified in *Elby's Big Boy*.

### A. Strength of mark

"[O]nce a mark has been registered for five years, the mark must be considered strong and worthy of full protection." *Wynn Oil I*, 839 F.2d at 1187; 15 U.S.C. § 1065. Here, Blockbuster's trade marks "Blockbuster" and "Blockbuster Video," have been registered since 1986, more than five years prior to the commencement of this action. Therefore, those marks are incontestible and Defendant cannot argue that the marks are merely descriptive and worthy of little protection. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

Blockbuster's marks are entitled to even stronger protection because they suggest the features of Blockbuster's product and because Blockbuster has established secondary meaning in its mark through extensive use, advertising, commercial success, and unsolicited media coverage. The protection afforded a trademark depends on the strength or weakness of a mark. The stronger a trademark, the greater the protection afforded. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 967 (6th Cir.1987). The strength of the mark analysis focuses on the "distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). A mark's strength is measured by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *Id.* The four basic classifications of trademark, based upon the inherent distinctiveness of the mark and arranged from least to greatest protection accorded, are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* The Second Circuit has defined these categories as follows:

A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and with ease of establishing infringement.

*Id.* (citations omitted).

In *Kraft General Foods*, 831 F.Supp. 123 (S.D.N.Y.1993), the manufacturer of "Bull's-Eye" barbecue sauce brought a trademark action against the manufacturer of "Raging Bull" sauce. The court held that the plaintiff was entitled to a preliminary injunction, holding in part that "Bull's-Eye" is a suggestive mark because "Bull's-Eye" does not describe the barbecue sauce or any of its features, qualities, or ingredients, and that the consumer must "extrapolate from the words of the mark and use imagination to determine the nature of the goods marketed under the Bull's-Eye brand name." *Id.* at 129. The court further held that "even the term 'bull,' which is part of both marks at issue in this case, is not a generic term when used in connection with barbecue sauce. 'Bull' does not describe the product or its features. The consumer must use imagination to connect the term 'bull' with barbecue sauce." *Id.*

Blockbuster presents an even stronger case for a suggestive mark than the plaintiff in *Kraft General Foods*. Here, the term "Blockbuster" does not describe the products or the features of the products rented by Blockbuster, i.e., video cassettes. Rather, the term "Blockbuster" is commonly understood as meaning a hit movie. While Blockbuster's stores rent many video cassettes, its stores' inventories contain only a small percentage of titles that can be characterized fairly as "blockbusters." Therefore, the mark "Blockbuster" requires consumers to use their imagination to determine that "Blockbuster" means a purveyor of video cas-

sette rentals, including some former "blockbuster" movies. And as in *Kraft General Foods*, even the term "buster" is not generic when used in connection with video cassette rentals. "Buster" does not describe video cassettes or the features of video cassettes.

■ A mark also may be considered strong if it has acquired a strong secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187, 72 L.Ed.2d 606 (1982). The common factors tending to show secondary meaning are (1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Kraft General Foods v. Allied Old English*, 831 F.Supp. 123; *see also Quality Inns Intern., Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 211–12 (D.Md.1988) ("Mc" trademark held entitled to the "strongest protection" because of advertising expenditures, wide recognition, commercial success, and media coverage).

■ Blockbuster's marks "Blockbuster" and "Blockbuster Video" have acquired a secondary meaning. Blockbuster spent approximately $75 million on advertising its marks in 1993, and expects to double that expenditure this year. As described *supra*, Blockbuster has experienced tremendous success under its marks, with systemwide revenue totalling nearly $3 billion. Its total revenue is greater than its next 375 competitors combined. Pat Jordan, *Wayne Huizenga*, N.Y. Times, Dec. 5, 1993, at section 6, page 54. More than 40 million people carry Blockbuster membership cards. *Id.* Further, unsolicited media articles on Blockbuster show that Blockbuster's name is highly distinctive and that Blockbuster's reputation as a family-oriented business is a significant business asset. *See id.;* Rupert Steiner, "Clash of video rental giants," *London Times*, June 26, 1994. For example, one article compared Blockbuster's mark to McDonald's golden

arches. Jordan. Therefore, Blockbuster's marks have acquired secondary meaning. Thus, Blockbuster's marks are entitled to the highest protection.

### B. Relatedness of the goods

■ "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 582 (2d Cir.1991). In this case, Blockbuster and Video Busters are in direct competition with each other in renting video cassettes to customers in metropolitan Detroit. Therefore, this factor weighs heavily toward a finding of confusion.

### C. Similarity of the marks

■ Under this factor, a court must determine, in light of what occurs in the marketplace, whether the mark "will be confusing to the public when singly presented." *Wynn Oil I,* 839 F.2d at 1187 (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir.1983)). In evaluating similarity, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Id.* (quoting *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980)). Rather, "[a] proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* at 1188.

Video Busters argues that a comparison of the color schemes and typefaces of the marks shows that they are dissimilar. On the one hand, the Blockbuster trademark is associated with a representation of a torn ticket consisting of yellow block lettering on a dark royal blue background. This trademark is used consistently on all Blockbuster signs, cassette jackets, brochures, membership applications, and membership cards. On the other hand, the Video Busters marks vary tremendously among and within their stores. On the sign for the Lincoln Park store, "Video Busters" appears in royal blue fancy capital lettering on top of a movie reel on a yellow background. "Video Busters Superstore" is written in red fancy capital letters across a purple movie reel on the brochure

and membership card. On the membership application, "Video Busters" is written in italicized capital letters. Finally, "Video Busters" is written in shadowed capital letters on some coupons. On a sign at the St. Clair Shores store, "Video" is written in yellow script, "Busters" is written in red capital letters, and "Superstores" is written in small white capital letters on a red background. And on a sign at the Southfield store, "Video Busters" is written in dark blue fancy capital letters on a white background, which in turn is on a light blue background. The brochure, membership card, membership application and cassette jackets at that store carry a likeness of the Ghostbusters movie trade mark.

Blockbuster argues, however, that the Sixth Circuit has rejected such a side-by-side comparison. "It is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Wynn Oil I,* 839 F.2d at 1187. In *Wynn Oil I,* the district court focused on a side-by-side comparison of the two marks in question, finding it significant that the defendant used the name "Classic Car Wash" in print lettering with a mixture of upper and lower case letters, while the plaintiffs used its trademark "Classic" in script letter similar to calligraphy to market their car care products and car wash. *Wynn Oil Co. v. Thomas,* 669 F.Supp. 831, 835 (M.D.Tenn. 1986). The Sixth Circuit reversed, holding that the District Court erred by examining the two marks side-by-side and that the two marks were likely to cause confusion because they both used names containing the term "Classic" to market their car washes and products. *Wynn Oil I,* 839 F.2d at 1187–88. The court further held that

> [B]oth parties use the exact term "Classic," which obviously is pronounced, and verbally translated in exactly the same way. Also, the appearance of the marks is similar enough that it may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy impression or recollection' of the other party's mark.

*Id.* at 1188. Blockbuster argues that under *Wynn Oil* Video Busters' presentation of the individual visual differences between Block-

buster and Video Busters is immaterial to the court's determination. But the holding of *Wynn Oil* is not that the court cannot look at the individual differences between an original mark and an alleged infringing mark. Rather, the holding of *Wynn Oil* is that slight differences between two marks do not render the alleged infringing mark unlikely to cause confusion. *Wynn Oil* merely instructs that a court must focus on the overall impression of the two marks, rather than let itself become overly concerned with slight individual differences between the two marks. In other words, *Wynn Oil's* lesson is that the court should not miss the forest for the trees. But *Wynn Oil* does not say that the court is prohibited from considering the trees in order to determine the character of the forest.

■ Therefore, the court must analyze the overall similarity of the marks, including the pronunciation, appearance, and verbal translation of conflicting marks. *Id.* Individual comparisons of Blockbuster and Video Busters may be included in this analysis. The court finds that, on the basis of the similar names, the marks are similar on the whole. Though the appearance of Blockbuster's and Video Busters' marks are very different, "buster" is pronounced and verbally translated in exactly the same manner in both names. As in *Wynn Oil,* the two marks in question contain an identical term, i.e., "buster." The fact that the defendant's mark in *Wynn Oil* contained additional words—"Classic Car Wash" as opposed to "Classic"—did not change the Sixth Circuit's ruling that the marks were likely to cause confusion. Nor does the different placement of the term "Video" in "Blockbuster Video" and "Video Busters" change the fact that the names are likely to cause confusion. While the differences in appearance between the two marks may dispel confusion eventually, the confusion in name is critical. Gerald Geddis, a Blockbuster senior vice president, testified that consumers may travel to a Video Busters store thinking it is affiliated with Blockbuster. Upon entry into the Video Busters store they may realize that Video Busters is not connected to Blockbuster, but at that point consumers are unlikely to leave Video Busters to seek out a Blockbuster store. Rather, Geddis testified, consumers are more likely to rent a video cassette at Video Busters because of convenience.

Video Busters argue that the even the names "Blockbuster Video" and "Video Busters" are not similar. Video Busters argue that "Blockbuster" is a single compound word that has a specific meaning within the movie industry which suggests a smash hit movie. The name "Video Busters," however, consists of two separate words which do not individually or collectively reference hit movies. While a single change in the last portion of a trade mark may render the entire mark so dissimilar that there is no likelihood of confusion between the marks, *see e.g., Hill-yard Chemical Co. v. Vestal Lab, Inc.,* 206 F.2d 926 (C.C.P.A.1953) ("shine-all" and "brighten-all" dissimilar); *Harris Mfg. Co. v. Werber Sportswear Co.,* 183 F.2d 105 (C.C.P.A.1950) ("zeroland" and "zero king" dissimilar), the cases Video Busters rely upon do not support their position. In those cases, the change in the last portion of the trade mark was attached to the word "all" or "zero," two very common words that did not aid consumers in identifying a product. In this case, however, the term "video" and "block" is attached to the word "buster," a unique and distinctive word that is a critical factor in identifying Blockbuster's products. For example, because of the word "buster," a consumer is likely to identify a group of video cassettes labeled "Chartbusters" as a Blockbuster product.[1]

Video Busters finally argue that their use of a name confusingly similar to "Blockbuster Video" is not actionable under the Lanham Act if customers are not likely to be confused at the time they actually rent video tapes in Video Busters' stores. Specifically, Video Busters argue that while consumers are likely to be confused initially by the similarity of

---

1. This is not to say that any use of the suffix "-buster" would infringe Blockbuster's mark. For example, a store selling health food named "Fat Busters" would not appear to be confusingly similar to "Blockbuster." There, use of the word "busters" has an independent meaning, i.e., to destroy fat. Here, use of the name "Video Busters" for a video cassette rental store makes no sense other than to sound similar to "Blockbuster Video."

the two stores' names, they are not likely to be confused once they enter Video Busters' stores to actually rent video cassettes because of the different appearance and layout of Video Busters and Blockbuster Video's stores.

█ The Sixth Circuit, however, held that the Lanham Act's protection is not limited to confusion at the "point of sale," i.e., the time when actual purchases take place. Rather, the Act protects against confusion among potential customers and protects the reputation among the general public of trade mark holders. *Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235, 1245 (6th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). In *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir. 1975), the court explained that the issue in a trade mark action is not limited to whether a purchaser would buy an allegedly infringing product thinking it was actually a product of or had some connection to the owner of the original mark. Instead, the court held that the issue is the degree of likelihood that the allegedly infringing name would attract potential customers based on the reputation earned by the owner of the original mark.

Therefore, the issue in this case is the degree of likelihood that the name "Video Busters" would attract potential customers based on the reputation built by Blockbuster. That a customer would recognize that Video Busters is not connected to Blockbuster after entry into a Video Busters store and viewing the Video Busters membership application, brochure, video cassette jacket, and store layout is unimportant. The critical issue is the degree to which Video Busters might attract potential customers based on the similarity to the Blockbuster name. The court finds that Video Busters might attract some potential customers based on the similarity to the Blockbuster name. Because the names are so similar and the products sold are identical, some unwitting customers might enter a Video Busters store thinking it is somehow connected to Blockbuster.

Those customers probably will realize shortly that Video Busters is not related to Blockbuster, but under *Esercizio* and *Grotrian* that is irrelevant.[2]

## D. Evidence of actual confusion

█ Evidence of actual confusion is a strong indication that a likelihood of confusion exists. *Kraft General Foods,* 831 F.Supp. at 130. But since actual confusion is difficult to prove, a plaintiff need not show it to prevail under the Lanham Act. *Wynn Oil I,* 839 F.2d at 1188. Nevertheless, Blockbuster introduced a scientific survey by marketing expert Dr. Ivan Ross, Ph.D., that it contends establishes that 13.8 percent of the Detroit-area public is confused as to the identity or origin between the video cassette rental store names "Blockbuster Video" and "Video Busters." Moreover, the study suggested that 22.2 percent of those who had been in both a Blockbuster and Video Busters store were confused. Survey results showing 15–20 percent confusion has corroborated a finding of likely confusion in other cases. *See e.g., RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058 (2d Cir.1979); *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976); *Consolidated Freightways, Inc. v. Central Transport, Inc.,* 201 U.S.P.Q. (BNA) 524, 1978 WL 21387 (E.D.Mich.1978).

Dr. Ross's survey is entitled to some weight, but is not conclusive. Dr. Ross, a Professor of Marketing at the University of Minnesota, is an extremely well-qualified expert. He specializes in "[l]egal applications of consumer behavior, marketing/advertising research, motivation research ..., survey/experimental/design and questionnaire construction, industrial and organizational psychology," and has testified in numerous other trade mark cases.

Dr. Ross's surveyors intercepted shoppers at metropolitan Detroit-area malls and showed respondents a set of video store

---

**2.** Moreover, because it would be inconvenient to leave one video store to find another, those customers lured to a Video Busters store may rent video cassettes from that store despite having realized that it bears no connection to Blockbuster.

names.[3]  One set included "Blockbuster Video;" the other set "Video Busters."  Surveyors then asked respondents to recall which stores they had just seen in order to assess the extent to which respondents would mistakenly identify the "Video Busters" store name as having been "Blockbuster Video," or the store name "Blockbuster Video" and "Video Busters."  Next, the surveyors handed back to the respondents the same list of stores, but with the addition of two store names, one of which was "Blockbuster Video," for respondents who had seen only "Video Busters" before, or "Video Busters," for respondents who had seen only "Blockbuster Video" before.  Respondents were then asked which of these stores, if any, they had been in so that surveyors could determine whether a responded had ever visited either or both of the parties' video rental stores.  Surveyors then asked respondents to identify which, if any, of these store names they thought were connected or affiliated.  The results suggest that 13.8 percent of the respondents were confused as to identity or origin between "Blockbuster Video" and "Video Busters," and that 22.2 percent of those who had been in both a Blockbuster and Video Busters store were confused.  Dr. Bonnie Reece, Ph.D., an associate professor of advertising at Michigan State University, confirmed that Dr. Ross's study was conducted with appropriate methodology and meaningfully measured some forms of confusion that are important in marketing terms.

The Court finds some problems with this study, however.  The survey asked respondents to identify which, if any, of the store names were affiliated or connected.  Even though the question provided respondents with the option of finding no relationship between any of the stores, this question to some extent asks respondents to look specifically for a relationship between two of the store names, and is therefore a leading question.  Dr. James Leiman, Ph.D., a vice president of Market Opinion Research, pinpointed this same problem with Dr. Ross's survey.  Neither Dr. Leiman nor the Court, however, is an expert on these surveys.  On balance, the survey must be given some weight.

**3.**  The surveyors first ensured that the respondent lived in the metropolitan Detroit area and had

### E.  Marketing channels used

The greater degree in which the parties use the same or similar marketing channels, the greater is the likelihood of confusion.  A senior vice president of Blockbuster testified that Blockbuster advertises on national and local television programs, radio, and in print.  Video Busters did not submit any evidence specifically concerning the marketing channels it uses.  Nevertheless, Blockbuster and Video Busters both market their stores in the metropolitan Detroit area and both market retail to the general public rather than wholesale to a specific industry or trade group.  Therefore, this factor tends toward a likelihood of confusion.

### F.  Likely degree of purchaser care

The less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion.  *Wynn Oil Co. v. American Way Service Co. ("Wynn Oil II")*, 943 F.2d 595, 602 (6th Cir.1991).  Where a product is inexpensive, purchasers are less likely to exercise a great degree of care in determining the origin of a product.  *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051 (6th Cir.1982).  For example, courts have found that purchasers exercise a low degree of care when purchasing candles, *id.*, and bread loaves, *American Bakeries Co. v. Pan-O-Gold Baking Co.*, 1 U.S.P.Q.2d 1331, 1333, 1986 WL 15069 (D.Minn.1986), because both are inexpensive.  Similarly, video cassette rentals are inexpensive—they cost $3.25 at Blockbuster—and require little sophistication to select.  Therefore, consumers are not likely to exercise a high degree of care in their rentals.  The likelihood of confusion is thus greater.

### G.  Defendant's intent in selecting the mark

Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion.  *Wynn Oil II*, 943 F.2d at 602.  Intent to infringe can be shown

been in a video rental store in the past six months.

by circumstantial evidence. "[U]se of a mark with knowledge of another's prior use supports an inference of intentional infringement." *Id.* at 603. Moreover, where "trademarks [have] been ... long in use and ... widely advertised, it is presumed that [the infringer] had knowledge of [the marks] ..." *Id.*

In the present .case, "Blockbuster" and "Blockbuster Video" had been registered and in use in 1986, three years prior to when Defendants began to use the name "Video Busters." While Blockbuster did not open stores in Michigan until 1989, Blockbuster and its franchises that year operated more than 1,000 stores worldwide. Therefore, it can be inferred that Defendants knew of Plaintiff's "Blockbuster Video" family of marks and its commercial success.

Video Busters' weak explanations as to how they chose the name "Video Busters" provides further evidence that Defendants intended to infringe Blockbuster's marks. Only the principal of Video Busters, Inc., Shakir Alkhafaji, has explained why he chose his store's name, and his explanations were inconsistent. First, Mr. Alkhafaji testified that he picked "Video Busters" to imitate the name of the popular movie "Ghostbusters." Second, Mr. Alkhafaji testified that he chose the name because his video store was growing so fast that it was "busting through the walls." Defendants Laylco, Inc., and Video Investment, Inc., have not indicated why they picked the name "Video Busters."

## H. Likelihood of expansion of the product lines

A strong possibility that either party may expand its business to compete with the other tends toward a finding of infringement. *Wynn Oil II,* 943 F.2d at 604. This factor is irrelevant to this case because both parties already are in the video cassette rental business in the metropolitan Detroit area.

## I. Summary

Blockbuster has shown that its trade mark is extremely strong, that Blockbuster and Video Busters stores both are in the video cassette rental business, that the name "Vid-

eo Busters" is similar to the name "Blockbuster Video," that there is some evidence of actual confusion, that Blockbuster and Video Busters both market their goods retail in the metropolitan Detroit area, that purchasers are unlikely to exercise a great degree of care renting video cassettes, and that Video Busters intended to infringe Blockbuster's trade mark. Thus, Blockbuster is likely to succeed on the merits of its Lanham Act claim.

## IV. Irreparable injury

A party seeking an injunction must show that absent the injunctive relief, it would suffer irreparable harm. *Wynn Oil II,* 943 F.2d at 608. Nevertheless, "[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." *Id.* (quoting *Koppers Co., Inc. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 849 (W.D.Pa.1981)). The irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values ..." *Id.* The court already has found a likelihood of confusion. The court also finds that Video Buster's use of its current name harms Blockbuster's goodwill and business reputation. Blockbuster has spent a substantial amount of money promoting its marks so that consumers encountering a retail store renting video cassettes using the "-buster" designation will associate the store with Blockbuster and its family-oriented reputation. This reputation would be diluted if Video Busters were permitted to continue to use its confusingly similar name because Video Busters stores carry video cassettes of movies rated "X" or "NC–17," while Blockbuster refuses to carry such videos, and because two of the Video Busters stores have been charged with copying tapes in violation of federal copyright laws. Defendant Videobusters, Inc., has entered into two guilty pleas for criminal copyright violations. Defendant Laylco, Inc., was sued by Columbia Pictures last year for copying tapes and entered into a permanent injunction agreeing not to do so again.

Video Busters argues that Blockbuster's five-year delay in bringing this action shows

lack of irreparable harm. Specifically, Video Busters argue that Video Busters stores have been in existence under the name "Video Busters" since 1989, that Blockbuster employs large firms to conduct searches to protect its marks, and that Video Busters did not receive notice until 1994 that Blockbuster believed the "Video Busters" trade name is confusingly similar to "Blockbuster Video." "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275–76 (2d Cir.1985).

But Blockbuster has adequately explained its delay in bringing suit. Cecilia Dempsey, Assistant General Counsel for Blockbuster testified that in May of 1993 she began the process of combing the trademark register for potentially infringing names and prosecuting claims against those infringers. Dempsey further testified that this process was very time consuming and that it did not come to her attention until the fall of 1993 that video cassette rental stores named "Video Busters" exist in the metropolitan Detroit area. Dempsey testified that at that point she contacted the stores and asked them to change their name, but that they refused. Based on the foregoing, Video Busters has not overcome the presumption of irreparable harm that follows a finding of likely confusion.

## V. Harm to others

■ The potential harm to Video Busters if enjoined from using their current name is easily outweighed by the irreparable harm suffered by Blockbuster if the court did not issue an injunction and by Blockbuster's likelihood of success on the merits. Though Video Busters would pay to change its signs, membership cards, brochures, and video cassette jackets, enjoining Video Busters' use of its current name would not diminish significantly any goodwill or business reputation earned from its name "Video Busters." First, Video Busters has been in existence for only five years, and it has not produced

evidence of an extensive advertising campaign to promote its name. The only evidence in the record of Video Busters advertising is a few coupons. Second, Mr. Alkhafaji, the principal of Video Busters, Inc., testified that he recently purchased a new video cassette rental store in Waterford, Michigan, but has not changed that store's name to "Video Busters" because the store had already acquired goodwill with its customers by use of its original name. Mr. Alkhafaji apparently does not believe that Video Busters' name has developed a sufficiently significant amount of goodwill to justify changing the name of a newly-acquired video cassette rental store. Finally, Video Busters have not acquired a high degree of goodwill through the use of their mark. Each Video Busters store looks different from the others. Therefore, an injunction would not deprive Video Busters of goodwill acquired through the consistent use of their mark.

## VI. Public interest

■ Trademark laws are designed to prevent consumer confusion and to protect the right of the trademark owner to control its product's reputation. *United States v. Hon,* 904 F.2d 803, 806 (2d Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991). Therefore, it is in the public interest to prevent consumer confusion between "Blockbuster Video" and "Video Busters," and to protect Blockbuster's investment in promoting its name and reputation.

## VII. Conclusion

For the foregoing reasons, the Court finds that Blockbuster has demonstrated likelihood of success on the merits, irreparable harm, that an injunction will not significantly harm Video Busters, and that the public interest favors the grant of an injunction. Therefore, the court hereby GRANTS Plaintiff's motion for preliminary injunction. Defendants are hereby ENJOINED from using the mark "Video Busters" or any confusingly similar designations thereof, including any mark with the suffix "-buster."