# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1771

TY INC.,

*Plaintiff-Appellee,*

v.

RUTH PERRYMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8190—**John F. Grady**, *Judge.*

ARGUED SEPTEMBER 11, 2002—DECIDED OCTOBER 4, 2002

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* Ty Inc., the manufacturer of Beanie Babies, the well-known beanbag stuffed animals, brought this suit for trademark infringement against Ruth Perryman. Perryman sells second-hand beanbag stuffed animals, primarily but not exclusively Ty's Beanie Babies, over the Internet. Her Internet address ("domain name"), a particular focus of Ty's concern, is bargainbeanies.com. She has a like-named Web site (http://www.bargainbeanies.com) where she advertises her wares. Ty's suit is based on the federal antidilution statute, 15 U.S.C. § 1125(c), which protects "famous" marks

from commercial uses that cause "dilution of the distinctive quality of the mark." See *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 214-16 (2d Cir. 1999). The district court granted summary judgment in favor of Ty and entered an injunction that forbids the defendant to use "BEANIE or BEANIES or any colorable imitation thereof (whether alone or in connection with other terms) within any business name, Internet domain name, or trademark, or in connection with any non-Ty products." Perryman's appeal argues primarily that "beanies" has become a generic term for beanbag stuffed animals and therefore cannot be appropriated as a trademark at all, and that in any event the injunction (which has remained in effect during the appeal) is overbroad.

The fundamental purpose of a trademark is to reduce consumer search costs by providing a concise and unequivocal identifier of the particular source of particular goods. The consumer who knows at a glance whose brand he is being asked to buy knows whom to hold responsible if the brand disappoints and whose product to buy in the future if the brand pleases. This in turn gives producers an incentive to maintain high and uniform quality, since otherwise the investment in their trademark may be lost as customers turn away in disappointment from the brand. A successful brand, however, creates an incentive in unsuccessful competitors to pass off their inferior brand as the successful brand by adopting a confusingly similar trademark, in effect appropriating the goodwill created by the producer of the successful brand. The traditional and still central concern of trademark law is to provide remedies against this practice.

Confusion is not a factor here, however, with a minor exception discussed at the end of the opinion. Perryman is not a competing producer of beanbag stuffed animals,

and her Web site clearly disclaims any affiliation with Ty. But that does not get her off the hook. The reason is that state and now federal law also provides a remedy against the "dilution" of a trademark, though as noted at the outset of this opinion the federal statute is limited to the subset of "famous" trademarks and to dilutions of them caused by commercial uses that take place in interstate or foreign commerce. "Beanie Babies," and "Beanies" as the shortened form, are famous trademarks in the ordinary sense of the term: "everybody has heard of them"; they are "truly prominent and renowned," in the words of Professor McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 24:109, p. 24-234 (2001), as distinguished from having a merely local celebrity. *TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 98-99 (2d Cir. 2001). And while both this court and the Third Circuit have held, in opposition to the Second Circuit's *TCPIP* decision, that "fame," though it cannot be local, may be limited to "niche" markets, *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640-41 (7th Cir. 1999); *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164 (3d Cir. 2000), this is not a conflict to worry over here; Ty's trademarks are household words. And Perryman's use of these words was commercial in nature and took place in interstate commerce, and doubtless, given the reach of the aptly named World Wide Web, in foreign commerce as well.

But what is "dilution"? There are (at least) three possibilities relevant to this case, each defined by a different underlying concern. First, there is concern that consumer search costs will rise if a trademark becomes associated with a variety of unrelated products. Suppose an upscale restaurant calls itself "Tiffany." There is little danger that the consuming public will think it's dealing with a branch of the Tiffany jewelry store if it patronizes this restaurant.

But when consumers next see the name "Tiffany" they may think about both the restaurant and the jewelry store, and if so the efficacy of the name as an identifier of the store will be diminished. Consumers will have to think harder—incur as it were a higher imagination cost—to recognize the name as the name of the store. *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549-50 (7th Cir. 1982); cf. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989) ("The [legislative] history [of New York's antidilution statute] disclosed a need for legislation to prevent such 'hypothetical anomalies' as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns' "); 4 *McCarthy on Trademarks and Unfair Competition, supra*, § 24:68, pp. 24-120 to 24-121. So "blurring" is one form of dilution.

Now suppose that the "restaurant" that adopts the name "Tiffany" is actually a striptease joint. Again, and indeed even more certainly than in the previous case, consumers will not think the striptease joint under common ownership with the jewelry store. But because of the inveterate tendency of the human mind to proceed by association, every time they think of the word "Tiffany" their image of the fancy jewelry store will be tarnished by the association of the word with the strip joint. *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2d Cir. 1996); 4 *McCarthy on Trademarks and Unfair Competition, supra*, § 24:95, pp. 24-195, 24-198. So "tarnishment" is a second form of dilution. Analytically it is a subset of blurring, since it reduces the distinctness of the trademark as a signifier of the trademarked product or service.

Third, and most far-reaching in its implications for the scope of the concept of dilution, there is a possible concern with situations in which, though there is neither blurring nor tarnishment, someone is still taking a free

ride on the investment of the trademark owner in the trademark. Suppose the "Tiffany" restaurant in our first hypothetical example is located in Kuala Lumpur and though the people who patronize it (it is upscale) have heard of the Tiffany jewelry store, none of them is ever going to buy anything there, so that the efficacy of the trademark as an identifier will not be impaired. If appropriation of Tiffany's aura is nevertheless forbidden by an expansive concept of dilution, the benefits of the jewelry store's investment in creating a famous name will be, as economists say, "internalized"—that is, Tiffany will realize the full benefits of the investment rather than sharing those benefits with others—and as a result the amount of investing in creating a prestigious name will rise.

This rationale for antidilution law has not yet been articulated in or even implied by the case law, although a few cases suggest that the concept of dilution is not exhausted by blurring and tarnishment, see *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1326 (9th Cir. 1998); *Intermatic, Inc. v. Toeppen*, 947 F. Supp. 1227, 1238-39 (N.D. Ill. 1996); *Rhee Bros., Inc. v. Han Ah Reum Corp.*, 178 F. Supp. 2d 525, 530 (D. Md. 2001), and the common law doctrine of "misappropriation" might conceivably be invoked in support of the rationale that we have sketched. See Rochelle Cooper Dreyfuss & Roberta Rosenthal Kwall, *Intellectual Property: Cases and Materials on Trademark, Copyright and Patent Law* 137-38 (1996). The validity of the rationale may be doubted, however. The number of prestigious names is so vast (and, as important, would be even if there were no antidilution laws) that it is unlikely that the owner of a prestigious trademark could obtain substantial license fees if commercial use of the mark without his consent were forbidden despite the absence of consumer confusion, blurring, or tarnishment. Competition would drive the fee to zero since, if the name

is being used in an unrelated market, virtually every prestigious name will be a substitute for every other in that market.

None of the rationales we have canvassed supports Ty's position in this case. Perryman is not producing a product, or a service, such as dining at a restaurant, that is distinct from any specific product; rather, she is selling the very product to which the trademark sought to be defended against her "infringement" is attached. You can't sell a branded product without using its brand name, that is, its trademark. Supposing that Perryman sold *only* Beanie Babies (a potentially relevant qualification, as we'll see), we would find it impossible to understand how she could be thought to be blurring, tarnishing, or otherwise free riding to any significant extent on Ty's investment in its mark. To say she was would amount to saying that if a used car dealer truthfully advertised that it sold Toyotas, or if a muffler manufacturer truthfully advertised that it specialized in making mufflers for installation in Toyotas, Toyota would have a claim of trademark infringement. Of course there can be no aftermarket without an original market, and in that sense sellers in a trademarked good's aftermarket are free riding on the trademark. But in that attenuated sense of free riding, almost everyone in business is free riding.

Ty's argument is especially strained because of its marketing strategy. As we explained in an earlier case brought by Ty, *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1173 (7th Cir. 1997), Ty deliberately produces a quantity of each Beanie Baby that fails to clear the market at the very low price that it charges for Beanie Babies. The main goal is to stampede children into nagging their parents to buy the new Baby lest they be the only kid on the block who doesn't have it. A byproduct (or perhaps additional goal)

is the creation of a secondary market, like the secondary market in works of art, in which prices on scarce Beanie Babies are bid up to a market-clearing level. Perryman is a middleman in this secondary market, the market, as we said, that came into existence as the result, either intended or foreseen, of a deliberate marketing strategy. That market is unlikely to operate efficiently if sellers who specialize in serving it cannot use "Beanies" to identify their business. Perryman's principal merchandise is Beanie Babies, so that to forbid it to use "Beanies" in its business name and advertising (Web or otherwise) is like forbidding a used car dealer who specializes in selling Chevrolets to mention the name in his advertising.

It is true that Web search engines do not stop with the Web address; if Perryman's Web address were www.perryman.com but her Web page mentioned Beanies, a search for the word "Beanies" would lead to her Web page. Yet we know from the events that led up to the passage in 1999 of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), that many firms value having a domain name or Web address that signals their product. (The "cybersquatters" were individuals or firms that would register domain names for the purpose of selling them to companies that wanted a domain name that would be the name of their company or of their principal product.) After all, many consumers search by typing the name of a company in the Web address space (browser) on their home page rather than by use of a search engine. We do not think that by virtue of trademark law producers own their aftermarkets and can impede sellers in the aftermarket from marketing the trademarked product. In this respect the case parallels our most recent decision dealing with Ty's intellectual property, in which we found that Ty was attempting to control the market in collectors' guides to Beanie Babies by an overly expansive in-

terpretation of its copyrights. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512 (7th Cir. 2002).

We surmise that what Ty is seeking in this case is an extension of antidilution law to forbid commercial uses that accelerate the transition from trademarks (brand names) to generic names (product names). Words such as "thermos," "yo-yo," "escalator," "cellophane," and "brassiere" started life as trademarks, but eventually lost their significance as source identifiers and became the popular names of the product rather than the name of the trademark owner's brand, and when that happened continued enforcement of the trademark would simply have undermined competition with the brand by making it difficult for competitors to indicate that they were selling the same product—by rendering them in effect speechless. Ty is doubtless cognizant of a similar and quite real danger to "Beanie Babies" and "Beanies." Notice that the illustrations we gave of trademarks that became generic names are all descriptive or at least suggestive of the product, which makes them better candidates for genericness than a fanciful trademark such as "Kodak" or "Exxon." Ty's trademarks likewise are descriptive of the product they denote; its argument that "Beanies" is "inherently distinctive" (like Kodak and Exxon), and therefore protected by trademark law without proof of secondary meaning, is nonsense. A trademark that describes a basic element of the product, as "Beanies" does, is not protected unless the owner can establish that the consuming public accepts the word as the designation of a brand of the product (that it has acquired, as the cases say, secondary meaning). *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). As the public does with regard to "Beanies"—for now. But because the word is catchier than "beanbag stuffed animals," "beanbag toys," or "plush toys," it may

someday "catch on" to the point where the mark becomes generic, and then Ty will have to cast about for a different trademark.

Although there is a social cost when a mark becomes generic—the trademark owner has to invest in a new trademark to identify his brand—there is also a social benefit, namely an addition to ordinary language. A non-trivial number of words in common use began life as trademarks. See, e.g., Shawn M. Clankie, "Brand Name Use in Creative Writing: Genericide or Language Right?" in *Perspectives on Plagiarism and Intellectual Property in a Postmodern World* 253 (Lisa Buranen and Alice M. Roy eds. 1999); Monroe Friedman, "The Changing Language of a Consumer Society: Brand Name Usage in Popular American Novels in the Postwar Era," 11 *Journal of Consumer Research* 927 (1985). An interpretation of antidilution law as arming trademark owners to enjoin uses of their mark that, while not confusing, threaten to render the mark generic may therefore not be in the public interest. Moreover, the vistas of litigation that such a theory of dilution opens up are staggering. Ty's counsel at argument refused to disclaim a right to sue the publishers of dictionaries should they include an entry for "beanie," lowercased and defined as a beanbag stuffed animal, thus accelerating the transition from trademark to generic term. He should have disclaimed such a right. See *Illinois High School Ass'n v. GTE Vantage Inc.*, 99 F.3d 244, 246 (7th Cir. 1996); 2 *McCarthy on Trademarks and Unfair Competition*, *supra*, § 12:28, pp. 12-79 to 12-81.

We reject the extension of antidilution law that Ty beckons us to adopt, but having done so we must come back to the skipped issue of confusion. For although 80 percent of Perryman's sales are of Ty's products, this means that 20 percent are not, and on her Web page after listing the

various Ty products under such names as "Beanie Babies" and "Teenie Beanies" she has the caption "Other Beanies" and under that is a list of products such as "Planet Plush" and "Rothschild Bears" that are not manufactured by Ty. This is plain misdescription, in fact false advertising, and supports the last prohibition in the injunction, the prohibition against using "Beanie" or "Beanies" "in connection with any non-Ty products." That much of the injunction should stand. But Ty has not demonstrated any basis for enjoining Perryman from using the terms in "any business name, Internet domain name, or trademark."

We can imagine an argument that merely deleting "Other Beanies" is not enough; that if the other beanbag stuffed animals look much like Ty's, consumers might assume they are "Beanies," or if not, that they still might associate "Beanies" with these other animals, causing the term to lose its distinctness as the name of Ty's products. But we do not understand Ty to be seeking a broadening of the injunction to require a disclaimer as to the source of the non-Ty products sold by Perryman. This however is a matter that can be pursued further on remand.

So the judgment must be vacated and the case remanded for the formulation of a proper injunction. But is more open on remand? The judge merely granted summary judgment for Ty, and we are merely reversing (in part) that ruling. Ordinarily this would mean that Ty would have a shot at a trial in which it might try to convince the judge (as there is no jury in trademark cases) that its rights under antidilution law really were violated. But this case is unusual because, given Perryman's status as a seller in the secondary market created as a result of Ty's marketing strategy, we cannot imagine a state of facts consistent with the extensive record compiled in the summary judgment proceeding that could possibly justify an

injunction against Perryman's representing in her business name and Internet and Web addresses that she is doing what she has a perfect right to do, namely sell Beanie Babies. We therefore direct that the proceedings on remand be limited to the reformulation of the injunction in conformity with this opinion.

VACATED AND REMANDED
WITH INSTRUCTIONS.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*