**ESPN, INC., Plaintiff,**

v.

**QUIKSILVER, INC., Defendant.**

**Quiksilver, Inc., Counterclaimant,**

v.

**ESPN, INC., Counterdefendant.**

**No. 08–CV–4222.**

United States District Court,
S.D. New York.

Nov. 14, 2008.

See also 581 F.Supp.2d 542.

Eileen Mary Cunningham, Frank W. Ryan, Tamar Y. Duvdevani, Nixon Pea-

body LLP, New York, NY, for Plaintiff/Counterdefendant.

Sara Jaclyn Goldfarb, Kenneth Conboy, Latham & Watkins LLP, New York, NY, Jennifer L. Barry, Latham & Watkins LLP, San Diego, CA, Mark Andrew Finkelstein, Latham & Watkins, Costa Mesa, CA, for Defendant.

## DECISION AND ORDER DENYING PLAINTIFF/COUNTERDEFENDANT'S MOTION TO DISMISS

McMAHON, District Judge:

### I. Introduction

On May 2, 2008, ESPN, INC. ("ESPN") filed a complaint against Quiksilver, Inc. ("Quiksilver"), alleging trademark infringement under Section 32(a) of the Lanham Trademark Act, 15 U.S.C. § 1114(a), trademark infringement and unfair competition under 15 U.S.C. § 1125(a), anti-dilution under New York GBL § 360–1, and trademark infringement under New York common law. On June 16, 2008, Quiksilver filed an answer, in which it denied many of the complaint's allegations, asserted affirmative defenses, and counterclaimed for declaratory relief, trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), trademark dilution under N.Y. GBL § 360–1, unfair competition under New York common law, and cancellation of federal registrations under 15 U.S.C. § 1064 and 15 U.S.C. § 1119.

Plaintiff/Counterdefendant has moved to dismiss all but one of Quiksilver's counterclaims.

The motion is denied.

### II. Background

The issue in this case is who rightfully owns the intellectual property rights in a stylized "X," which each party claims is its well-recognized trademark.

### A. The parties

ESPN, a Delaware corporation with a principal place of business in Bristol, Connecticut, is a multinational sports entertainment company. *See* Cplt. ¶ 2. In the mid–1990's, ESPN created the X Games, an international alternative sports competition featuring "sports" like skateboarding, snowboarding, and surfing. *Id.* ¶¶ 4–5. ESPN owns pending trademark applications for its stylized X Games mark, which it affixes on goods that are sold at X Games events, on the internet, and in department stores. *Id.* ¶¶ 13–16.

Quiksilver, a Delaware corporation with a principal place of business in Huntington Beach, California, is a manufacturer of boardshorts and other clothing products for surfers. *See* Counterclaim ¶¶ 6–7. Quiksilver products are sold throughout the world, primarily in surf shops, snow shops, skate shops, and department stores. *Id.* ¶ 11. Quiksilver claims that it began using the "X" symbol on its products since no later than 1986. *Id.* ¶ 15.

### B. Quiksilver's counterclaims

Quiksilver claims its use of the X as a mark, "which has been incorporated into many different designs, constitutes a trademark of Quiksilver." *Id.* ¶ 15. Quiksilver asserts that the many different designs "are collectively referred to as the 'Gen X Brand.'" *Id.* It claims that the Gen X Brand "has been used in connection with a variety of products and marketing materials." *Id.* ¶ 16. All of the Gen X designed feature the letter X. *Id.* ¶ 16. Quicksilver contends that its use of the Gen X Brand, with its complementary "X" ornamentation on its products and in its advertising, continued through the present; it cites in particular the "Quiksilver X" design as being first introduced no later than 1994. *Id.* ¶ 26. The "Quiksilver X" design features the Quiksilver Logo—a

mountain and wave logo used as a stand-alone mark—inside a thick black X. *Id.*

Quiksilver believes that ESPN turned to Quiksilver for inspiration for use of the term "X" in the mid 1990s. *Id.* ¶¶ 27–28. ESPN originally called its extreme sports competition "Extreme Games," but changed that to "X Games" after the inaugural 1995 event. *Id.* ¶¶ 27, 30. Defendant pleads, "that long after Quiksilver launched its Gen X Brand, ESPN and its sales staff still did not even understand the significance of the letter 'X' as it related to Generation X, and requested information on that significance." *Id.* ¶ 29.

Quiksilver alleges five counterclaims against ESPN. The First Counterclaim is for Declaratory Relief. Quiksilver asks the Court to declare that (a) Quiksilver is the senior user of the Gen X Brand; (b) Quiksilver's use of Xs on its products as complementary ornamentation to the Gen X Brand is non-trademark use; (c) Quiksilver's use of the Gen X Brand does not infringe or dilute ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use; (d) Quiksilver's use of the Gen X Brand does not constitute unfair competition vis-à-vis ESPN's X Games Marks because Quiksilver has priority of use and/or the use of Xs as ornamentation is non-trademark use; and (e) Quiksilver's use of the Gen X Brand does not dilute ESPN's X Games Marks because the X Games Marks are sufficiently diluted by the voluminous third party use of X-related marks such that Quiksilver's marks cannot further dilute them. ESPN has not moved to dismiss this counterclaim.

Quiksilver's Second Counterclaim is for a violation of 15 U.S.C. § 1125(a). It alleges that Quiksilver has consistently used the Gen X Brand on its products and has established significant common-law trademark rights in connection with its Gen X Brand. Quicksilver alleges that it has "su-perior rights and priority in and to the Gen X Brand" by virtue of having adopted the logo a decade before ESPN invented The X Games, and avers that ESPN, as the junior user, "has been and is engaged in trademark infringement and unfair competition" which is "knowing and willful." *Id.* ¶¶ 48–49.

Quiksilver's Third Counterclaim alleges Trademark Dilution under N.Y. GBL § 360–1 due to ESPN's alleged dilution of Quiksilver's Gen X Brand by virtue of the X Games Marks. *Id.* ¶¶ 54–56.

Quiksilver's Fourth Counterclaim is for New York Common Law Unfair Competition and alleges that ESPN's "bad faith misappropriation of Quiksilver's Gen X Brand, in particular, its copying of the "Quiksilver X" design, violates New York common law." *Id.* ¶ 58.

Quiksilver's Fifth Counterclaim seeks cancellation of the X Games trademark registrations based upon fraud and ESPN's failure to inform the USPTO of Quiksilver's alleged senior rights in the Gen X Brand. *Id.* ¶¶ 60–64. It alleges it is being damaged by the fraudulently obtained X Games federal registrations, because those registrations are either being asserted against it now or may be asserted in future lawsuits. *Id.*

## C. ESPN's motion to dismiss

In its request for dismissal of the counterclaims, ESPN claims that Quiksilver fails to state a claim upon which relief can be granted. *See* Motion to Dismiss at 7. Specifically, ESPN contends that, "Nowhere in Quiksilver's pleading does it allege, either outright or by implication, the necessary elements of a trademark or an unfair competition claim under the Lanham Act or New York common law." *Id.* at 2. According to ESPN, Quiksilver has never alleged that it owns a valid and protectible trademark that it uses in com-

merce as an indication of source or origin; that such trademark is being or was infringed by ESPN; or that a likelihood of confusion exists between any of Quiksilver's designs and any mark used by ESPN, *Id.* at 2, 7. ESPN further contends that Quiksilver does not allege that its mark or marks is or are famous, extremely strong, or even distinctive, a threshold requirement for a claim of trademark dilution under New York General Business Law. *Id.* at 2. Finally, ESPN claims that Quiksilver "lacks standing to assert its claim for cancellation of ESPN's incontestable trademarks and trademark applications for the X Games trademarks because it has not (and cannot) allege the type of damage required under the Lanham Act to assert such a claim." *Id.*

## DISCUSSION

### (a) Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. "The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff." *In re Bayou Hedge Fund Litigation,* 534 F.Supp.2d 405, 413 (S.D.N.Y.2007) (McMahon, J.). On a motion to dismiss, the court must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, ——, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); *see also Fershtadt v. Verizon Communications Inc.,* 550 F.Supp.2d 447, 451 (S.D.N.Y.2008) (McMahon, J.). "The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff." *Lee v. Sony BMG Music Entertainment, Inc.,* 557 F.Supp.2d 418, 423 (S.D.N.Y.2008) (citation omitted); *accord Thomas v. City of New York,* 143 F.3d 31, 37 (2d Cir.1998). "The issue [on a motion to dismiss] is not whether a plaintiff will ultimately prevail but whether the claim-

ant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

In *Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007), the United States Supreme Court "retired" the *Conley v. Gibson* standard, which had previously held that dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80(1957). The *Bell Atlantic* Court held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (internal citations and quotations omitted). To survive a motion to dismiss, a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted). Where a party has not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 1974.

The United States Court of Appeals for the Second Circuit has since interpreted the *Bell Atlantic* holding to mean that "the [Supreme] Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegation in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007); *see also Fershtadt,* 550 F.Supp.2d at 451. Moreover, "just two

weeks after issuing its opinion in *Bell Atlantic,* the Court cited it for the traditional proposition that [s]pecific facts are not necessary [for a pleading that satisfies Rule 8(a)(2) ]"; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, ——, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic's* quotation from *Conley* ) (omission in original)." *Iqbal,* 490 F.3d at 157.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading that states a claim for relief must contain: ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Only when a party fails to plead the elements of its cause of action must the claim be dismissed. *See, e.g., Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 630 n. 11 (S.D.N.Y.2003) (where plaintiff "fails to allege a fundamental element of a Lanham Act claim," motion to dismiss is granted); *see also In re Terrorist Attacks on September 11, 2001,* 464 F.Supp.2d 335, 340 (S.D.N.Y.2006) (where "[p]laintiffs have not offered any factual allegations against defendants that state a cause of action under the foregoing standards," a motion to dismiss under Rule 12(b)(6) was granted).

**(b) Quiksilver's claim under 15 U.S.C. § 1125(a) (Second Counterclaim)**

■ Under 15 U.S.C. § 1125(a), "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which—... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or ... in commercial advertising or pro-

motion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a). Hence, under the Lanham Act, "What plaintiff needs to demonstrate is that it has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993); *see also 1–800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 406–07 (2d Cir.2005) (Under 1125(a)(1), "a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale ... or advertising of goods or services, (5), without the plaintiff's consent.") (internal quotations and citation omitted); *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,* 425 F.Supp.2d 402, 411 (S.D.N.Y.2006) ("Courts often narrow this analysis to two prongs: (1) the validity of plaintiff's trademark and (2) likelihood of confusion.").

The parties disagree about whether Quiksilver has alleged that it owns a valid and protectible trademark that it has used in commerce. *See* Pl. Motion to Dismiss at 12–13; Def. Response at 3–4. After reading the counterclaims and drawing all proper inferences, the court concludes that Quiksilver has met the pleading standard here.

■ "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation ... they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.... The latter three categories of

marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615. 768 (1992). "A single letter can never be other than "arbitrary," i.e., it could not be considered a generic term for a product or merely descriptive of the product to which it is associated." *Professional Sound Services, Inc.*, 349 F.Supp.2d at 732. Furthermore, X, or any other letter standing alone, can be a protectible mark. *See* 15 U.S.C. § 1127; *Michelin Tire Corporation v. the General Tire & Rubber Company*, 202 U.S.P.Q. 294, 298 (T.T.A.B 1979) ("There is nothing . . . in decisional law to preclude a single letter from functioning as a trademark and, in fact, from serving as an arbitrary and strong mark."); 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 7:11 (4th ed.2008). However, any mark "that does not perform the role of identifying a source is not a trademark." *Am. Express Co. v. Goetz*, 515 F.3d 156, 159 (2d Cir. 2008). Additionally, unshaded linear representations of common shapes or letters are referred to as "basic" and are not protectible as inherently distinctive, "because to protect them as trademarks would be to deprive competitors of fundamental communicative devices essential to the dissemination of information to consumers." *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir.2005). "However, stylized letters or shapes are not "basic," and are protectable when original within the relevant market." *Id.*

■ Where, as here, plaintiff has not registered its trademark, it is "required to show that its use of a single letter is capable of distinguishing its goods from those of others, i.e., its use of the letter . . . is distinctive." *Professional Sound Services, Inc.*, 349 F.Supp.2d at 731.

■ Here, Quiksilver pleads that it has created unique designs for its letter "X." *See* Counterclaim at ¶ 15 ("The X symbol, which has been incorporated into many different designs, constitutes a trademark of Quiksilver."). Quiksilver has asserted that it repeatedly used the "X" in conjunction with many of its products. *See id.* Moreover, Quiksilver explicitly alleges that, "Consumers recognize and associate the Gen X Brand as originating from Quiksilver." *See* Counterclaim ¶ 47.

ESPN's allegation that "the pleading fails to allege any use on goods as a signifier of origin" is simply wrong. *See* Motion at 12. Quiksilver thoroughly laid out its long history of many types of "X" usage, alleging that, "By virtue of its longstanding use of the Gen X Brand, Quiksilver has developed a valuable reputation for quality and goodwill associated with that brand. Consumers recognize and associate the Gen X Brand as originating from Quiksilver." *See* Counterclaim ¶ 47. Quiksilver is entitled to offer evidence to support the claims at trial on this matter.

Quiksilver has also adequately pled that ESPN's use of the X mark is likely to cause consumer confusion.

■ "To state a claim for trademark infringement under sections 32(1)(a) and 43(a) of the Lanham Act, plaintiff must allege facts which establish that her mark merits protection and that Defendants' use of her mark is likely to cause consumer confusion as to the mark's source." *Arnold v. ABC, Inc.*, No. 06 Civ. 1747(GBD), 2007 WL 210330, at *2 (S.D.N.Y. Jan. 29, 2007), *citing Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir.2006).

In the counterclaim, Quiksilver describes and depicts a design that is, on its face, strikingly similar to one of ESPN's X Games logos—"the 'Quiksilver X' design, which was first introduced no later than 1994. . . ." *See* Counterclaim ¶ 26. This

mark, "in particular," is a design that is representative of Quiksilver's continuous featuring of the X on its Gen X products and advertising. *See* Counterclaim ¶ 26. In the Complaint, ESPN depicts a stylized X mark for which it "owns pending trademark applications" and has been "used since 2005." *See* Cplt. ¶ 13. Quiksilver reproduces this mark in the counterclaim and notes the pending applications, and expressly alleges that "ESPN has begun using these logos on its X Games website...." *See* Counterclaim ¶ 35.

Looking at both logos side by side reveals ample reason not to dismiss at the pleading stage. To the court's eye, the two "Xs" are similar enough that a consumer might well confuse them. And ESPN has itself asserted that the parties' marks cannot co-exist in the marketplace. *See generally* Cplt. ESPN explicitly stated in its complaint that "Quiksilver's use of the Infringing Mark is likely to cause mistake or confusion among consumers, or to deceive consumers, by causing them to believe incorrectly, that Quiksilver's business is related to, associated with, sponsored by, or connected with ESPN and/or ESPN's X Games." *See* Cplt. ¶ 22. Quiksilver has pled ownership of a valid and protectible common-law mark, acknowledged ESPN's claim and asserted ESPN was the junior user (*see* Counterclaim ¶ 49). That alone gets Quiksilver past a motion to dismiss the counterclaim, since a reasonable reader could infer that Quiksilver alleges that ESPN's mark would cause consumer confusion to the Gen X Brand.

ESPN argues that, "At best, Quiksilver has identified a series of disparate designs,

not a trademark or a series of trademarks. These designs are alleged by Quiksilver to be ornamental non-trademarks," (*see* Motion at 14), and that, "Quiksilver itself affirmatively *disavows* trademark use of such [Quiksilver X] symbol and that design." *See* Motion at 12. ESPN does not appear to have read the counterclaims. The motion to dismiss the second counterclaim is denied.

### (c) Quiksilver's trademark dilution claim under N.Y. Gen. Bus. Law § 360–1 (Third Counterclaim)

■ Quiksilver's third counterclaim alleges trademark dilution in violation of the New York General Business Law § 360–1, New York's Anti–Dilution statute. *See* Counterclaim ¶¶ 34–37. Under GBL § 360–1, "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." The stated legislative intent of Article 24, of which 360–1 was a part, was "to provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, as amended. To that end, the construction given the federal act should be examined as persuasive authority for interpreting and construing this act." 1996 Sess. Law News of N.Y. Ch. 319 (S.5730–C).[1]

---

1. The purpose of the predecessor statute to § 360–1, which was § 368–d, was "to prevent 'the whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products.' Thus, a claim for dilution lies where it is shown that 'a defendant is attempting to feed[] upon the business reputa-

tion of an established distinctive trade-mark or name.' " *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 133–34 (S.D.N.Y.1993) (citations omitted). Section 368–d was repealed effective Jan. 1, 1997, and was replaced with the corresponding § 360–1, *See* N.Y. GBL § 360–1.

Under the Federal Trademark Dilution Act, "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Pursuant to this federal statute, a mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties, (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark, (iii) The extent of actual recognition of the mark, (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. § 1125(c)(2)(A).

 Quiksilver maintains that it "need only allege that its mark is distinctive." *See* Response at 6. ESPN acknowledges that "at the very least," a plaintiff "must ... plead that its mark is distinctive, if not famous or extremely strong." *See* Motion at 17. Both the federal and the New York statutes "protect against the unauthorized use of marks that impairs the goodwill and value of plaintiff's mark." *MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.,* No. 00 Civ. 6068(GBD), 2004 WL 434404, at *6 (S.D.N.Y. March 8, 2004). Under the New York statute, as this court has applied it, though, "The mark need not be "famous" or "celebrated," but it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning." *Kraft General Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 134 (S.D.N.Y.1993) (citations omitted). "The Second Circuit has held that [§ 360–l] protects only "extremely strong marks," and has noted that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." " *Swatch Group (U.S.) Inc. v. Movado Corp.,* No. 01 Civ. 0286(RLC), 2003 WL 1872656, at *6 (S.D.N.Y. April 10, 2003), citing *id.; see also Johnson & Johnson v. The American Nat. Red Cross,* 552 F.Supp.2d 434, 447 (S.D.N.Y.2008) (Only extremely strong marks are entitled to protection under § 360–1). "In sum, the statute protects a trademark's 'selling power.' " *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624–25 (2d Cir.1983)).

As noted above, Quiksilver's exhaustive description of its repeated use of the "X" is enough to infer that it pleads that one or more of the Gen X Brand logos have become distinctive source identifiers. The word "distinctive," for these purposes, need not be used. *See* Fed.R.Civ.P. 8. It is enough that Quiksilver thoroughly laid out the long history of its types of "X" usage and then alleged that, "By virtue of its longstanding use of the Gen X Brand, Quiksilver has developed a valuable reputation for quality and goodwill associated with that brand. Consumers recognize and associate the Gen X Brand as originating from Quiksilver." *See* Counterclaim ¶ 47. ESPN pleads, in the original complaint, that, "Quiksilver's use of the infringing mark in the conduct of trade constitutes unfair and deceptive practices."

*See* Cplt. ¶ 35. Quicksilver has done nothing more than plead, "I'm not diluting YOUR mark; rather, you are diluting MY mark!"

The cases ESPN cites in support of dismissal are completely inapposite. Most of them are decisions regarding motions for summary judgment and/or injunctions. *See, e.g., Ty Inc. v. Perryman,* 306 F.3d 509, 511–15 (7th Cir.2002) (appeal from summary judgment and injunction); *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2d Cir.1996) (appeal from denial of permanent injunction); *Cartier, Inc. v. Deziner Wholesale, L.L.C.,* 55 U.S.P.Q.2d 1131, 1136 (S.D.N.Y. April 03, 2000) (summary judgment and injunction); *Nabisco, Inc. v. PF Brands, Inc.,* 50 F.Supp.2d 188, 203, 205–210 (S.D.N.Y.1999) (preliminary injunction); *NBA Properties v. Untertainment Records LLC,* No. 99 CIV. 2933(HB), 1999 WL 335147, at *8 (S.D.N.Y. May 26, 1999) (preliminary injunction); *Mattel Inc. v. Jcom Inc.,* 48 U.S.P.Q.2d 1467, 1470, 1998 WL 766711 (S.D.N.Y. Sept. 10, 1998) (judgment and permanent injunction following bench trial); *Nikon, Inc. v. Ikon Corp.,* 803 F.Supp. 910, 927–28 (S.D.N.Y.1992) (Rule 52(a) injunction). On preliminary injunction motions, the plaintiff cannot rest on its pleadings, but must offer evidence showing that it is likely to prevail on the merits at trial. Similarly, on a motion for summary judgment a party must lay bare its *proof* in order to raise a genuine issue of fact; it cannot simply rest on allegations.

No such obligation rests on Quiksilver at this stage; since it has not moved for a preliminary injunction or for summary judgment, it has no obligation to *prove* anything. The test on a motion directed at a pleading is much less stringent: do the allegations of the counterclaims, read most favorably to the pleader, state a claim for relief? Quiksilver has more than met that standard.

ESPN does cite two cases in which the court granted a motion to dismiss. In *The Christopher P. Smithers Foundation, Inc. v. St. Lukes–Roosevelt Hosp. Center,* No. 00 CIV. 5502(WHP), 2001 WL 761076, at *6 (S.D.N.Y. July 6, 2001), the defendants' motion to dismiss was granted because plaintiffs did not plead that they owned a famous mark as required by 15 U.S.C. § 1125(c)(1) and so could not establish a prima facie case of dilution or tarnishment under the Lanham Act. In *Smithers,* the court declined to exercise supplemental jurisdiction on the state law claims after issuing a motion to dismiss on the federal claims, and did not analyze the sufficiency of the pleading under N.Y. GBL § 360–1. *Id.* at *6. It is, therefore, inapposite.

In the second case, *SMJ Group, Inc. v. 417 Lafayette Restaurant LLC,* No. 06 Civ. 1774(GEL), 2006 WL 2516519, at *4 (S.D.N.Y. Aug. 30, 2006), the court dismissed a claim under N.Y. GBL § 360–1 because plaintiff had failed to plead facts tending to show public recognition of two local New York City restaurants. Here, plaintiff has pleaded sufficient facts to get past a pre-answer motion. Quiksilver pleads that, "Since at least 1989, Quiksilver has consistently used the Gen X Brand on its products." Counterclaim ¶ 46. It had "developed a valuable reputation for quality and goodwill associated with that brand. Consumers recognize and associate the Gen X Brand as originating from Quiksilver." Counterclaim ¶ 47. It asserted that "Quiksilver's use and rights in the Gen X Brand significantly predate, by approximately ten years, any use or rights ESPN has in the X Games Marks." Counterclaim ¶ 48. Moreover, Quiksilver asserts a worldwide presence by mentioning its European and Asia/Pacific headquarters and describing the "prestigious and highly influential cultural events and contests" it hosts around the world. Counterclaim ¶ 10, 12. Quiksilver asserts that its prod-

ucts "are sold in many countries throughout the world." Counterclaim ¶ 11. With these allegations, Quiksilver has done enough to state a claim-especially in view of ESPN's Complaint. The motion to dismiss the third counterclaim is denied.

### (d) Quiksilver's claim under New York Common Law Unfair Competition (Fourth Counterclaim)

ESPN argues that Quiksilver's Fourth Counterclaim for state law unfair competition fails to allege a valid and protectible trademark and a likelihood of confusion. *See* Motion at 11–14.

■■■ The elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F.Supp.2d 448, 456 (S.D.N.Y.2005) (internal quotation marks omitted). Thus, to state a claim for New York common law unfair competition, the party making the claim must demonstrate that (1) it "possesses a valid, protectible mark," *Chum Ltd. v. Lisowski*, No. 98 CIV. 5060(KMW), 2001 WL 243541, at *7 (S.D.N.Y. March 12, 2001) (citing *Tri–Star Pictures, Inc. v. Leisure Time Prods. B.V.*, 17 F.3d 38, 43 (2d Cir.), cert. denied, 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994)); and (2) that the result of the defendant's alleged use "is a likelihood of confusion between the marks of the alleged infringer and the charging party." *Jones Apparel Group, Inc. v. Piconne*, No. 94 CIV. 0754(LMM), 1994 WL 260767, at *3 (S.D.N.Y. June 8, 1994). *See also Twentieth Century Fox Film Corp., v. Marvel Enterprises, Inc.*, 220 F.Supp.2d 289, 297 (S.D.N.Y.2002) ("the standards for trademark infringement and dilution under New York common law are essentially the same as under the Lanham Act.").

■■■ "In a common law unfair competition claim under New York law, the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir.1995). "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) (collecting cases). "Central to this notion is some element of bad faith." *Id.* "Unfair competition, as a justiciable wrong under the common law, is a limited concept, although the scope of the doctrine, which has in recent years been expanded in some jurisdictions in varying degrees, cannot be precisely defined. It is a species of fraud or deceit." *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 71 A.D.2d 216, 422 N.Y.S.2d 85, (N.Y.App. Div. 1st Dep't 1979).

■■■ I have already held that Quicksilver has sufficiently alleged ownership of a valid and protectible mark. As for pleading likelihood of confusion, it is enough to say that ESPN was sufficiently worried about the likelihood of confusion to sue Quicksilver over its use of the "X" mark on its merchandise. As for alleging misappropriation and bad faith, Quiksilver easily satisfies any requirement at the pleading stage. Counterclaim ¶ 58. The Quiksilver X design is, at first glance, similar to the X Games logo for which ESPN owns pending trademark applications. *See* Cplt. ¶ 13; Counterclaim ¶ 35. The motion to dismiss the fourth counterclaim is denied.

### (e) Quiksilver's request for cancellation of the X Games federal registrations under 15 U.S.C. § 1064 and 15 U.S.C. § 1119 (Fifth Counterclaim)

■■■ ESPN's allegation that Quiksilver lacks standing to seek cancellation of

ESPN's trademarks is utterly without merit.

"A plaintiff seeking cancellation of a federal trademark registration under 15 U.S.C. § 1119 must satisfy the standing requirements set forth in 15 U.S.C. § 1064." *Akhenaten v. Najee, LLC*, 544 F.Supp.2d 320, 333 n. 16 (S.D.N.Y.2008). 15 U.S.C. § 1064 states in relevant part: "A petition to cancel a registration of a mark, stating the grounds relied upon, may ... be filed as follows by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark...." Quiksilver alleges that it "is being damaged by the fraudulently-obtained X Games Federal Registrations, because those registrations are either being asserted against Quiksilver in this litigation or may be asserted against Quiksilver in future lawsuits or opposition/cancellation proceedings." Counterclaim ¶ 64. Indeed, ESPN has already sued Quicksilver, in this very action. Quiksilver claims to be the senior user of the mark that has been registered, and is being used, by ESPN. It also alleges, by incorporation of prior allegations, that "As a proximate result of ESPN's acts, Quicksilver has suffered, and will continue to suffer, substantial damage to its reputation and goodwill, as well as injury to its current and potential customer base." Counterclaim ¶ 50. Put it all together and it adds up to standing to sue for cancellation of the marks that it claims are infringing on its own.

Nothing in *Yurman Design Inc. v. Chaindom Enterprises, Inc.*, No. 99 Civ. 9307(JFK), 2000 WL 897141 (S.D.N.Y. July 5, 2000) is to the contrary, and ESPN is simply wrong when it asserts that Quiksilver's fifth counterclaim is deficient "in exactly the same way" as was the complaint in Yurman. The complaint in Yurman was dismissed, even though the defendant alleged "no right to use the trademark at issue, THE CABLE COLLECTION, and no commercial or pecuniary interest in any trademark that is or will be damaged by continued registration of Plaintiff's trademark, because the Yurman complaint did not include a claim for trademark infringement or any other claim that placed the validity of the registered mark in issue." *Yurman Design Inc., supra.*, 2000 WL 897141, at *5. Here, by contrast, ESPN's own complaint alleges that Quicksilver is infringing its registered (or soon-to-be registered) mark, and defendant counterclaims for trademark infringement as well, claiming to be the senior user. ESPN's contention that its filing of trademark infringement claims against Quicksilver is insufficient to confer standing on a party who claims to be the senior user of the mark is simply silly.

The motion to dismiss the fifth counterclaim is denied.

### Conclusion

For the foregoing reasons, the motion to dismiss is denied in its entirety.