In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2815

JAMES G. HUGUNIN, LAND O' LAKES OUTDOORS, INC., and LAND O'LAKES TACKLE CO., INC.,

*Plaintiffs-Appellants*,

*v.*

LAND O' LAKES, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 9098 — **Joan B. Gottschall**, *Judge*.

ARGUED JANUARY 21, 2016 — DECIDED MARCH 1, 2016

Before POSNER, EASTERBROOK, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. James Hugunin, the principal plaintiff (the others are two companies he owns), manufactures and sells fishing tackle. Although he lives in Illinois and his companies are incorporated there, he began selling his tackle in a town in northeastern Wisconsin called Land O' Lakes because it is located in a region dotted with lakes and therefore attractive to fishermen—the region is also

called Land O' Lakes. Since his first sale, made in 1997 to a Wisconsin bait shop, Hugunin's enterprise has grown to a point at which his fishing tackle is sold to retailers in a number of states. In 2000 the U.S. Patent and Trademark Office registered LAND O LAKES as the trademark of his fishing tackle.

As it happens, Minnesota, which adjoins Wisconsin, is the home of a large agricultural cooperative named Land O' Lakes, Inc. that sells butter and other dairy products throughout the United States. It uses the same trademark on its products as Hugunin's companies do on their products— LAND O LAKES—and has been doing so since the 1920s, when the company was formed.

In 1997—the year Hugunin began selling fishing tackle— the dairy company became the official dairy sponsor of a sport-fishing tournament called the Wal-Mart FLW Tour and began advertising its dairy products in fishing magazines. Three years later, having learned that Hugunin had registered LAND O LAKES as the trademark of his fishing tackle, the dairy company wrote him that LAND O LAKES was *its* trademark, was "famous" because it had been in use since long before Hugunin had appeared on the scene, and that Hugunin was infringing it and to be permitted to continue using it would need a license from the dairy company. He refused either to apply for a license or to give up the trademark, thereby precipitating a proceeding by the dairy company in the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office opposing registration of Hugunin's trademark. (The original registration had lapsed; Land O' Lakes was opposing Hugunin's application to re-

register the trademark.) That proceeding is in a state of suspended animation pending the outcome of this case.

We're puzzled that the dairy company should have been worried by Hugunin's use of the same trademark. Though besides sponsoring the fishing tournament the company has advertised in fishing magazines and made other appeals to fishermen to buy its dairy products, it neither makes nor sells any devices or materials used in fishing (such as hooks, lines, sinkers, floats, rods, reels, baits, lures, spears, nets, gaffs, traps, waders, and tackle boxes—compendiously, fishing tackle)—any products, therefore, that might be confused with Hugunin's fishing tackle. It would be strange indeed for a dairy company to manufacture a product so remote from milk, butter, and cream, and there is no sign that the dairy company intends to take the plunge. The company sponsors the angling tournament and advertises in fishing magazines because fishermen, like the rest of us, are consumers of dairy products. *All* it advertises in those magazines are dairy products.

Equally puzzling, however, is why Hugunin and his companies are suing the dairy company for trademark infringement when there is nothing to suggest that the dairy company is thinking of making or selling fishing tackle. Can one imagine Land O' Lakes advertising: "we sell the finest dairy products *and* the best fishing tackle"? It might even benefit Hugunin to have consumers confuse his modest enterprise with the mighty Land O' Lakes and thus assume, albeit incorrectly, that they were buying their fishing tackle from a giant rather than a pygmy. Unsurprisingly there is no evidence of any such confusion.

Hugunin claims to have encountered difficulty in interesting investors in his companies because they're afraid the dairy company will sue the companies and may succeed in enjoining their use of the trademark, which indeed would hurt their sales. Presumably he filed this suit in order to preempt such a suit by the dairy company—and sure enough the dairy company counterclaimed, charging that the use of the LAND O LAKES trademark by Hugunin's companies was diluting the value of the dairy company's identical trademark.

The district judge dismissed the dilution claim after a bench trial as barred by laches (i.e., the dairy company had waited too long to make the claim), though even if laches hadn't been in the picture the dairy company would not have prevailed. As explained in *Ty Inc. v. Perryman*, 306 F.3d 509, 511 (7th Cir. 2002) (citations omitted), one theory underlying the dilution theory of trademark infringement is that

> consumer search costs will rise if a trademark becomes associated with a variety of unrelated products. Suppose an upscale restaurant calls itself "Tiffany." There is little danger that the consuming public will think it's dealing with a branch of the Tiffany jewelry store if it patronizes this restaurant. But when consumers next see the name "Tiffany" they may think about both the restaurant and the jewelry store, and if so the efficacy of the name as an identifier of the store will be diminished. Consumers will have to think harder—incur as it were a higher imagination cost—to recognize the name as the name of the store. So "blurring" is one form of dilution.

> Now suppose that the "restaurant" that adopts the name "Tiffany" is actually a striptease joint. Again, and indeed even more certainly than in the previous case, consumers will not think the striptease joint under common ownership with the jewelry store. But because of the inveterate tendency of the human mind to proceed by association, every time they think of the word "Tiffany" their image of the fancy jewelry store will be tarnished by the association of the word with the strip joint. So "tarnishment" is a second form of dilution. Analytically it is a subset of blurring, since it reduces the distinctness of the trademark as a signifier of the trademarked product or service.

It's difficult to fit the present case into either species of dilution. Everyone recognizes "Tiffany" as the name of a luxury jewelry store on Fifth Avenue in New York (with stores in other major cities), and seeing the name on a hot-dog stand a passerby might think of the jewelry store and of the incongruity of a hot-dog stand's having the same name; he might think the jewelry store's cachet impaired by the co-incidence and switch his patronage to Cartier or Harry Winston. Many consumers would recognize the name "LAND O LAKES" as referring to the dairy company, but we can't see how the company could be hurt by the use of the same name by a seller just of fishing tackle. The products of the two companies are too different, and the sale of fishing tackle is not so humble a business as the sale of hot dogs by street vendors. And so it is beyond unlikely that someone dissatisfied with LAND O LAKES fishing tackle would take revenge on the dairy company by not buying any of its products, or that a customer would have difficulty identifying Land O' Lakes' dairy products because he had seen the LAND O

LAKES mark used on Hugunin's fishing tackle. Land O' Lakes products are advertised on their labels as dairy or other food products (such as instant cappuccino mixes), never as products relating to fishing.

And the dairy company's mark is itself derivative from Minnesota's catchphrase "Land of 10,000 Lakes," see *Wikipedia*, "Minnesota," https://en.wikipedia.org/wiki/Minnesota (visited February 29, 2016), a phrase in such widespread use that the company could not insist that it was the sole lawful user of the phrase in advertising for *all* products.

The disparity in size between the contenders deserves emphasis. In 2012, the last year for which we have statistics, Land O' Lakes' sales of dairy foods exceeded $4 billion, while Hugunin's sales were less than $30,000. It's hard to believe that a giant dairy company wants to destroy or annex Hugunin's tiny fishing-tackle business, or that Hugunin's tackle sales are being kept down by Land O' Lakes' having an identical trademark.

As for Hugunin's claim of trademark infringement, which the district judge dismissed on Land O' Lakes' motion for summary judgment, it is not based on a contention that Land O' Lakes' trademark is invalid because it's identical to his trademark; that would be absurd, because Land O' Lakes has been using the trademark since the 1920s. His contention is that he is the first user of the mark in the fishing industry and therefore has priority over Land O' Lakes' use of the mark in that industry. Reverse confusion, as Hugunin's theory is called, refers to the situation in which a junior user of a trademark uses his size and market penetration to overwhelm the senior, but smaller, user. *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007); *Peaceable*

*Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 992–93 (7th Cir. 2004). Hugunin argues that consumers will be deceived into believing that the dairy company is the actual producer of his fishing tackle. But the dairy company's use of the same trademark is confined to products so different from Hugunin's that few if any consumers would think that simply by virtue of having an identical trademark the dairy company was competing with Hugunin in a different industry. See *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992); 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 24:3, at 166 (1991 Supp.); see also *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1166 (7th Cir. 1986).

A typical fishing-themed ad by the dairy company depicts the "Land O' Lakes Walleye Pro," a champion fisherman whom Land O' Lakes sponsors in fishing competitions in return for his promoting its dairy products. The fisherman is shown sitting next to packages of Land O' Lakes butter and cheese. The dairy company's logo is also found on fishing boats during tournaments. But just as no one watching a NASCAR race and seeing a racing car emblazoned with Budweiser's logo would think that the beer company had entered the automobile industry, so no one reading the "Walleye Pro" ad or seeing a boat sponsored by the dairy company would think that the advertiser sells fishing tackle.

Hugunin also complains that the dairy company has permitted some producers and sellers of fishing tackle—competitors of Hugunin's companies—to use its trademark. Were those firms licensees of Land O' Lakes, Hugunin might have a colorable claim of trademark infringement because then Land O' Lakes could be thought to be intentionally en-

couraging other fishing-tackle companies to infringe Hugunin's mark, as that would increase Land O' Lakes' revenues from licensing. In that event the dairy company might well be guilty of what is called secondary liability or contributory infringement. But there is no evidence that Land O' Lakes has issued any such licenses or is even aware that other producers of fishing tackle have used its mark.

So in this unusual case two firms sued each other though neither had been, is, or is likely to be harmed in the slightest by the other. The suit was rightly dismissed.